**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

**Civ. A. No. 87–0277–OG.**

United States District Court, District of Columbia.

Oct. 3, 1988.

---

Harold R. Henderson, Stephen C. Rogers, T. Michael Kerrine, William R. Perlik, Deanne C. Siemer, Michael L. Burack, Murray A. Indick, Washington, D.C., for plaintiff.

Gerald P. Norton, Washington, D.C., Laurence Z. Sheikman, Thomas E. Zemaitis, Philadelphia, Pa., for defendant.

## MEMORANDUM

GASCH, Senior District Judge.

## I. INTRODUCTION

This is a declaratory judgment action brought by the National Railroad Passenger Corporation ("Amtrak") against Consolidated Rail Corporation ("Conrail"). Amtrak seeks a determination that it is not required to pay on Conrail's behalf compensatory, punitive or exemplary damages awarded against Conrail resulting from a train wreck that occurred at Chase, Maryland, on January 4, 1987.

The Chase, Maryland train wreck was one of the worst disasters in railroad history, resulting in 16 deaths and more than 350 injury claims from Amtrak passengers and employees. Over sixty personal injury and wrongful death actions arising out of the Chase disaster have been brought against Amtrak and Conrail. Stipulation, filed November 5, 1987, ¶ 18. The plaintiffs in many of those cases allege that Conrail or Amtrak or both committed reckless, wanton, willful or grossly negligent acts and assert entitlement to compensatory and punitive damages totaling many millions of dollars. *Id.*

The accident occurred when an Amtrak train collided with three Conrail freight locomotives which had entered the path of the high-speed northbound Amtrak passenger train. Just prior to crossing over onto

the track being used by the Amtrak train, the Conrail engineer and brakeman in control of the Conrail locomotives had failed to heed a series of slow and stop signals at or before a track juncture near Chase, Maryland. The Conrail engineer has admitted to a host of wrongs: that the Conrail crew had recently used marijuana, was speeding, was operating a train in which the cab signal had been rendered inoperative because the light bulb had been removed from it, and was operating a train in which an audible warning device had been intentionally disabled. He has also admitted that he failed to call out signals to his brakeman, as required by applicable safety regulations, that he failed to maintain a proper lookout, and that he did not adhere to the cab signals or the wayside signals.[1] In a plea bargain arrangement with the State of Maryland, the engineer of the Conrail freight train involved in the Chase accident pleaded guilty on February 16, 1988, to a single count of manslaughter by locomotive that names all 16 persons killed in the train wreck. On March 29, 1988, the engineer was given the maximum penalty for manslaughter, five years imprisonment and $1,000 in fines. Additionally, on May 25, 1988, the Conrail engineer pleaded guilty to a federal charge of conspiring to obstruct the federal investigation of the accident.

At the time of the Chase accident, Conrail and Amtrak were parties to an agreement entitled "Second Amended and Restated Northeast Corridor Freight Operating Agreement" (hereinafter "Freight Operating Agreement") dated October 1, 1986. Stipulation, Filed November 5, 1987, ¶ 15; Agreements, Tab 22. This action seeks a declaration of the rights and obligations of the parties with respect to the indemnification provisions of the Freight Operating Agreement.

Armed with provisions of the Freight Operating Agreement which bear on liability apportionment, Conrail has demanded that Amtrak defend and indemnify it for any claims and damages arising out of the Chase accident. Amtrak contends that it need not indemnify Conrail for reckless, wanton, willful or grossly negligent acts or for punitive damages. Amtrak bases its contention on the argument that enforcement of the liability apportionment provisions would violate public policy in the case of findings of more than mere negligence or awards of punitive damages.

The Court has previously held that this case presents a justiciable controversy such that the issue presented falls within the scope of the Declaratory Judgment Act. *National Railroad Passenger Corp. v. Consolidated Rail Corp.*, 670 F.Supp. 424, 432 (D.D.C.1987). The issue presented in this case is whether Amtrak must indemnify Conrail for any damages—compensatory, punitive or exemplary—arising out of the Chase accident that are founded upon reckless, wanton, willful, or grossly negligent acts by Conrail.

In addition to determining that declaratory relief is proper in this case, the Court previously held that there was an issue of fact as to the intention of the parties, precluding summary judgment. *Id.* at 434. In early November of 1987, the Court held an evidentiary hearing in order to determine the intent of the parties at the time they entered the Freight Operating Agreement. The parties, in accordance with a stipulation filed on October 13, 1987, submitted proposed findings of fact and conclusions of law, as well as post-hearing memoranda. The evidentiary record before the Court principally derives from pre-hearing stipulations, the testimony heard at trial, designated deposition testimony, affidavits, joint exhibits, and the agreements and side letters covered in the evidentiary hear-

---

1. Amtrak asserts that Conrail's actions constitute a violation of Amtrak safety rules and may rise to the level of violations of the Federal Railroad Administration's regulations. The Court takes judicial notice of the transcript of the plea of guilty hearing in the Circuit Court for Baltimore County, Maryland, in case No. 87–CR–2420, *State of Md. v. Ricky Lynn Gates*, attached hereto and made a part hereof, and of the recent opinion in the multidistrict litigation currently pending in federal district court in Maryland. *See In re Rail Collision Near Chase, Maryland on January 4, 1987 Litigation*, MDL No. 782 (D.Md. Sept. 9, 1988).

ing. This memorandum represents the Court's findings of fact and conclusions of law.

## II. FINDINGS OF FACT

The Chase, Maryland disaster occurred on a stretch of railroad line known as the Northeast Corridor, which runs from Washington, D.C. to Boston, Massachusetts. Amtrak owns the segment of the Northeast Corridor that runs between Washington, D.C. and New York, which is the most heavily used rail line in the nation. At the time of the train wreck near Chase, Maryland, Conrail used the Northeast Corridor pursuant to the Freight Operating Agreement. The Second Amended and Restated Northeast Corridor Freight Operating Agreement dated October 1, 1986, between Amtrak and Conrail, Article Two, Section 2.2(d), respecting Operation, Management and Control, reads as follows:

All personnel, including employees of Conrail, rendering any services which involve responsibility for Amtrak's operating facilities or for the handling or movement of any trains over the NEC, shall be subject to the direction, supervision, and control of Amtrak, and *any such services performed by or for Conrail shall be governed by and subject to all then current operating and safety rules, orders and procedures of Amtrak* with respect thereto. Amtrak may, for cause, require that any person performing services hereunder be prohibited or removed from performance of such services, subject to the requirement that Amtrak shall support any action defending such prohibition or removal and bear the cost of any claims growing out of any improper prohibition or removal.

(Emphasis supplied).

The Freight Operating Agreement also bears on the liability apportionment between Amtrak and Conrail for the Chase accident. A series of indemnification clauses included in the Freight Operating Agreement contain the provisions for liability apportionment that are relevant to this case. The indemnification provisions in the agreement between Conrail and Amtrak are set forth in sections 5.3 and 5.6 of the Freight Operating Agreement. Agreements, Tab 22, §§ 5.3 & 5.6. Section 5.3 of the Freight Operating Agreement states as follows:

*Section 5.3. Amtrak Employees*

Amtrak agrees to indemnify and save harmless Conrail and Conrail Employees, irrespective of any negligence or fault of Conrail or Conrail Employees, or howsoever the same shall occur or be caused, from any and all liability for injury to or death of any Amtrak Employee, or for loss of, damage to, or destruction of the property of any such Amtrak Employee. It is expressly understood and agreed that Amtrak Employee furnished to Conrail, and Amtrak Employees who are involved in Amtrak's provision of services to Conrail, shall be regarded for purposes of this Article V as employees of Amtrak, and not of Conrail.

Section 5.6 provides:

*Section 5.6. Amtrak Passengers*

Amtrak agrees to indemnify and save harmless Conrail and Conrail Employees, irrespective of any negligence or fault of Conrail or Conrail Employees, or howsoever the same shall occur or be caused, from any and all liability for injuries to or death of any Amtrak Passenger and for loss of, damage to, or destruction of any property of any such passenger.

There are other sections of the Freight Operating Agreement that allocate liability to Conrail "irrespective of any negligence or fault of Amtrak or Amtrak Employees, or howsoever the same shall occur or be caused," for "any and all liability" arising from the injury or death of any Conrail employees, any injury, death or damage caused by the explosion or release of the contents of a Conrail train, and any injury, death or damage arising out of the transportation of hazardous or toxic material in Conrail trains. *See* Agreements, Tab 22, Sections 5.2, 5.7 & 5.12.

In addition, section 5.16 of the Freight Operating Agreement provides that the indemnifying party has the duty to defend such suits. Section 5.16 states:

In the event of any suit brought against either Conrail or Amtrak asserting a lia-

bility against which the other has agreed to indemnify and save harmless the party sued, the indemnifying party shall, at its sole cost and expense, defend such suit and indemnify and save harmless the parties sued against all costs and expenses thereof and promptly pay or cause to be paid any final judgment recovered against the party sued.

The agreement also provides for severability from the Freight Operating Agreement of clauses determined to be invalid, illegal or unenforceable. Section 4.7 of the Freight Operating Agreement states:

If any part of this Agreement is determined to be invalid, illegal or unenforceable, such determination shall not affect the validity, legality or enforceability of any other part of this Agreement and the remaining parts of this Agreement shall be enforced as if such invalid, illegal or unenforceable part were not contained herein.

In section 4.6 of the Freight Operating Agreement, the parties agreed that the agreement is governed by and should be construed in accordance with the laws of the District of Columbia.

In order to determine the intent of the parties in agreeing to the indemnification provisions in the Freight Operating Agreement, the Court has examined the negotiations and discussions culminating in this agreement and its predecessors. Because the language used in the Freight Operating Agreement's indemnification provisions can be traced back to 1972, the Court has heard testimony and examined the history of the language used in the various liability agreements between Amtrak and Conrail and the evolution of the indemnification provisions.

A. *The History of the Indemnification Provisions*

Many of the provisions in the 1986 Freight Operating Agreement, including the indemnification provisions at issue in this case are derived from the 1976 Northeast Corridor Freight Operating Agreement between Conrail and Amtrak. Those provisions were borrowed from an agreement struck between Amtrak and Burlington Northern in 1972. The origin of the indemnification provisions in all of these agreements can be traced to the railroad industry's 1971 negotiations with Amtrak in its infancy.

1. 1971–1972 Negotiations

Amtrak was created in the aftermath of heavy losses suffered by the railroad industry in providing passenger services. In 1970, Congress enacted the Rail Passenger Service Act, 45 U.S.C. § 501 *et seq.*, which provided for the creation of Amtrak as an intercity and commuter rail passenger service. *Id.* § 541. Amtrak was required to enter contracts with the railroads on or before May 1, 1971, to relieve the railroads of their responsibility for providing intercity rail passenger services. *Id.* § 561(a)(1).

Prior to the creation of Conrail, the Penn Central Transportation Company ("Penn Central") operated Amtrak's intercity passenger service in the Northeast Corridor. Amtrak owned no rail lines and had no operating personnel at that time, so it operated by contracting with the railroads, such as Penn Central, for the use of tracks, equipment, and personnel for the provision of intercity passenger service. After negotiations between Amtrak's incorporators and representatives of the freight railroads, Amtrak and the freight railroads entered into the National Railroad Passenger Corporation Agreement (the "Basic Agreement") dated April 28, 1971. Stipulation filed November 5, 1987 ¶ 4. The negotiators were unable to reach a permanent agreement regarding responsibility for casualty losses and other tort liability occasioned by the railroad's operation of passenger trains on Amtrak's behalf by and over the tracks of the various railroads. *Id.* ¶ 3.

Penn Central was among the freight railroad companies that entered into the Basic Agreement with Amtrak in the spring of 1971. *Id.* ¶ 4. Section 7.2 of the Basic Agreement set forth an interim arrangement governing responsibility for liability for casualty losses. It states:

Railroad agrees to assume all liability for injury to or death of persons or damage to or destruction of property arising out of activities conducted pursuant to this Agreement, and in consideration of the assumption of such liability NRPC agrees to pay to Railroad for each month during which such assumption is in effect an amount computed at the rate of 4% of all amounts reimbursable by NRPC to railroad for such month pursuant to this Agreement. *Commencing promptly after May 1, 1971, NRPC and Railroad will negotiate in good faith regarding a method of dealing with the matter of such liability and the risk thereof after December 1, 1971.* In the event the parties have not, by December 1, 1971, agreed upon such a method, which may be a percentage method or a legal apportionment of casualty liability or some other method, the determination thereof shall be submitted to arbitration pursuant to Article Six hereof not later than December 31, 1971, provided, however, that, taking into account (i) the inability of NRPC and Railroad in the time and on the data available to agree upon a satisfactory long-term method of dealing with such liability, (ii) the desire of both parties that Railroad be fairly compensated or [sic] assuming the risk of such liability, and (iii) the conviction of NRPC that in the light of experience, including the effect of reduction of Intercity Rail Passenger Service, a rate of not more than 2% will be fair for the future, if method determined by arbitration is a percentage method, the percentage shall not exceed 2% unless clear and convincing evidence establishes that a higher percentage is justified.

During the period such method is in the course of negotiation or arbitration, the method of handling such liability previously in effect shall be continued in effect on an interim basis.

Such arbitration shall be conducted by the National Arbitration Panel, and the parties shall make all reasonable efforts to expedite the arbitration.

In the event a percentage method is agreed upon or established by arbitration, it shall remain in effect for a minimum of one year prospectively after the same becomes established, after which the percentage may again be changed by arbitration.

Stipulation filed November 5, 1987, ¶ 4 (emphasis added). If the railroads were unable to agree with Amtrak on a permanent arrangement for the allocation of liability and risk by December 1, 1971, then the matter was to be submitted to arbitration no later than December 31, 1971. *See id.*

Beginning in the summer of 1971 and extending through early 1972, discussions and exchanges of correspondence ensued between Amtrak and an ad hoc subcommittee of the American Association of Railroads ("AAR") regarding a permanent replacement for section 7.2. Stipulation filed November 5, 1987, ¶ 5; Tr. 487–88, 121. In preparing for the discussions concerning liability apportionment, the chairman of the ad hoc subcommittee of the AAR sent a letter to the railroads on July 14, 1971, asking for their views about how to resolve the liability issue. Tr. 652–54; Joint Exh. 2. Among the responses received by the chairman was a letter from the Union Pacific Railroad dated August 2, 1971, which stated:

Because the indemnity law in many states is to the effect that an indemnity agreement will not be interpreted to be applicable with respect to losses due solely to the negligence of the indemnitee unless that intent is clearly and unequivocally expressed, the language of any arrangement reached with AMTRAK should be tailored appropriately if it is agreed, as appears to me to be desirable, that the risk of liability and of loss from casualties should be fixed between the railroads and AMTRAK independently of the cause of such loss insofar as negligence fault or similar considerations are concerned.

Tr. 655; Joint Exh. 3, p. 2. This response, as well as others received by the chairman, was circulated to members of the AAR subcommittee, including to Mr. Donald Brinkworth of Penn Central, a witness in this case. Mr. Brinkworth had knowledge

as of 1971 that under the law of various states, indemnification provisions purporting to indemnify someone against his own negligence are to be strictly and narrowly construed. Tr. 701–02.

On September 13, 1971, the negotiators for the railroad met with Amtrak's representatives to discuss the negotiation of a permanent agreement on liability. Tr. 655–56; Joint Exh. 6. At that meeting, Amtrak's representatives made clear their concern that the railroad safety programs not deteriorate. Tr. 658–59.

About a week later, on September 22, 1971, the AAR subcommittee sent a letter to Amtrak's representatives enclosing a draft proposal for a permanent liability agreement. Tr. 657–58; Joint Exh. 6. Several days later, on September 26, 1971, Amtrak appointed its first vice president-general counsel, Robert S. Medvecky, who almost immediately thereafter became involved with the renegotiation of section 7.2. Medvecky Affidavit ¶ 1, Tr. 116, Joint Exh. 102.

Sometime between September 26 and October 1, 1971, Mr. Medvecky met with members of the AAR subcommittee for the purpose of discussing changes in section 7.2. Tr. 121, 156, 163; *see also* Joint Exh. 100, pp. 1–3. The railroad representatives proposed to Mr. Medvecky that Amtrak serve as an insurer for the railroads with first dollar coverage, without limits. Tr. 121. Their proposal provided that Amtrak would be liable and would indemnify the railroad "regardless of the negligence of the railroad." Joint Exh. 6, p. 4; Tr. 121–22. Mr. Medvecky rejected this proposal. Tr. 122.

Amtrak representatives met again with the AAR subcommittee on November 12, 1971, in Jacksonville, Florida, in a continuing attempt to renegotiate section 7.2. Tr. 123. At that meeting, the railroads' position was that Amtrak should accept full and complete responsibility for all liability losses that the railroad might incur as a result of Amtrak's passenger service. Tr. 660–61; Joint Exh. 7, p. 3. Mr. Medvecky responded that Amtrak would never accept the premise that the entire cost of a collision between a passenger train and a freight train should be borne by Amtrak simply because it was in the business of providing passenger service. Tr. 661–62; Joint Exh. 7, pp. 3–4.

It was apparent at this juncture that Amtrak's efforts to reach an agreement with all of the freight railroads at once through negotiations with the subcommittee of the AAR were futile. Tr. 133. Following the November 1971 Jacksonville, Florida meeting, Amtrak's general counsel reported to the Amtrak Board of Directors that further discussions with the AAR subcommittee would not likely be productive. Mr. Medvecky proposed that Amtrak try to find one railroad to negotiate with individually rather than continuing to negotiate with the railroads as a group. Tr. 133. The chairman of Burlington Northern Railroad ("BN"), Lewis Menk, who was also a director of Amtrak, volunteered Burlington Northern to enter separate negotiations with Amtrak as a way of avoiding an impasse that appeared to be present in the negotiations between the subcommittee of the AAR and Amtrak. Tr. 522.

Beginning in December 1971, Amtrak and BN commenced bilateral negotiations in an effort to reach an agreement on a permanent replacement for the original section 7.2 in their Basic Agreement. Stipulation filed November 5, 1987 at ¶ 6. Amtrak envisioned that such an agreement would serve as a model to replace the original section 7.2 in the Basic Agreement with all of the railroads. *Id.* Negotiations between Amtrak representatives and representatives of BN took place in St. Paul, Minnesota on December 28 and 29, 1971, February 16, 1972, and March 1, 1972.[2]

---

**2.** Memoranda covering the proceedings during the negotiating sessions between Amtrak and BN were prepared jointly by the representatives of the two parties for the benefit of those not present at the negotiations. Transcript 553. *See* Joint Exhs. 10, 11. Additionally, Mr. H.B.

Krengel, Assistant Vice President and General Solicitor of BN, prepared detailed memoranda of the discussions for BN's internal use. Transcript 546–48, 552–54; Joint Exhs. 12, 13. These memoranda were accurate, reasonably complete, and covered all the points of significance

At the outset of its negotiations with Burlington Northern, Amtrak took the position that liability should be assigned on the basis of who was at fault for an accident. Tr. at 137–38; 527. Burlington Northern contended that Amtrak should fully indemnify the railroads, bearing complete liability for all passenger train accidents in an arrangement similar to the standard detour agreement.[3] Tr. 528; Joint Exh. 10 at 2, 5. Burlington Northern's negotiators persuaded Amtrak's negotiators that assigning liability on the basis of fault would encourage fighting among the defendants and enhance the cost of settling a claim, therefore, it would be an unsatisfactory solution to the liability question. Tr. 528, 533, 565; Joint Exh. 10 at 9.

During the negotiations, Burlington Northern's past claims experience was exhaustively reviewed, including examples of specific cases in its passenger train operations. Joint Exhs. 10 at 6; 12 at 3. The memoranda of the meetings do not reflect any discussions of the treatment of liability arising from passenger train accidents caused by gross negligence, recklessness, willful or wanton misconduct on the part of the railroad. Joint Exhs. 10–13. Nor do they reflect any discussions of the treatment of punitive damages arising from such accidents or passenger train accidents caused by drunken engineers. *Id.*

At the close of the first negotiating session, Burlington Northern and Amtrak agreed to exchange drafts of a new section 7.2 under which categories of claims would be assigned generally to one party or another by prior agreement, without regard to fault. Tr. 533–34, 536; Joint Exh. 10 at 3, 9–10, 15. Mr. Medvecky sent a draft of Amtrak's proposed section 7.2 to Burlington Northern on January 12, 1972. Joint Exh. 9; Tr. 149. The proposal provided for divisions or allocations of responsibility under which Amtrak would agree arbitrarily to carve out certain categories of liability that it would accept. Medvecky Affidavit

¶ 10, Joint Exh. 102; Tr. 180, 529; Joint Exh. 10 at 9. This draft proposal contained essentially the same language that is at issue in this case, including the phrases "irrespective of any negligence or fault ... or howsoever the same shall occur or be caused." Tr. 147–49; Joint Exh. 9. Mr. Medvecky believed that the use of the terms "or fault," "negligence," and "or howsoever the same shall occur or be caused," was redundant. Tr. 149. He believed claims relating to passengers were a minimal part of the total monetary cost of liability, in that the bulk of the liability cost was for claims relating to the injury or death of railroad employees under the Federal Employers Liability Act. Tr. 139, 144. Amtrak's proposal imposed liability upon Burlington Northern for death or injury to BN employees, and on Amtrak the liability for injuries or deaths involving Amtrak passengers and employees. Joint Exh. 10 at 3; Tr. 139.

Amtrak's proposal did not exclude gross negligence expressly because of Mr. Medvecky's belief that the line between negligence and gross negligence is subjective. Tr. 178, 180. Mr. Medvecky believed that under his proposed solution to the liability provision, Amtrak would have to pay compensatory damages for injuries to passengers in situations where the freight railroad's conduct included "some" gross negligence. Tr. 178, 180. He did not intend for his liability apportionment proposal to apply to punitive damages, or to misconduct that might lead to punitive damages, such as wanton, willful, or reckless misconduct. Tr. 168, 177, 180. At no time during the negotiations between Amtrak and Burlington Northern did any of Burlington Northern's negotiators ask Mr. Medvecky or suggest to anyone at Amtrak that the proposal would extend to cases involving gross negligence, or reckless, willful or wanton misconduct, or to conduct that would lead to an award of punitive damages. Tr. 152–53; Joint Exhs. 10–13. At no time during the negotiations when Bur-

---

that either party had made. Transcript 547–48, 554.

**3.** When one railroad uses the tracks of another railroad, it assumes the responsibility for any accident that may occur regardless of fault.

lington Northern was urging the adoption of the indemnification formula in the Standard Detour Agreement did Burlington Northern's representative mention that the United States Court of Appeals for the Fifth Circuit had held that indemnification formula invalid as a matter of public policy to the extent that it purported to extend to indemnification for willful or wanton misconduct by the railroad. Tr. 561–64; *see Alabama Great Southern R.R. v. Louisville & Nashville R.R.,* 224 F.2d 1 (5th Cir.1955).

Throughout the evidentiary hearing in the case, the parties raised discussions of a hypothetical accident caused by a drunken engineer. Frank S. Farrell, vice president-general counsel of Burlington Northern, who negotiated with Amtrak on behalf of Burlington Northern in 1972, does not recall any discussions about a hypothetical accident involving a drunken engineer during their negotiations. Tr. 566–67. Mr. Medvecky recalls having raised the hypothetical drunken engineer in discussions of indemnification for claims by railroad employees under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* Tr. 140–41. Mr. Farrell vaguely recalls discussing an *actual* accident that had occurred on the Northern Pacific in 1962 involving a drunken engineer but does not recall any discussions of a hypothetical drunken engineer. Tr. 531, 566–67, 570–71. Neither Mr. Farrell nor Mr. Medvecky testified that liability for punitive damages was a topic of discussion between Amtrak and Burlington Northern negotiators.

Mr. Farrell testified that he recalls discussing at the first negotiation meeting between BN and Amtrak the concept of the degree of fault as it would relate to the indemnification proposal. He testified that two employees in BN's claims department were present at the meeting for the purpose of providing statistical information concerning the frequency with which BN had been charged with gross negligence and punitive damages and about how standards of negligence vary from state to state. Tr. 530. The memorandum summarizing the discussions at that negotiation meeting reflects that Amtrak would accept full liability for death or injuries suffered by Amtrak passengers and employees irrespective of cause and would indemnify BN with respect thereto. Joint Exh. 10 at 3. The memorandum states that the parties recognized that " 'fault' was not a sound basis for arriving at a new agreement." *Id.* at 9. Instead, the parties agreed upon an "arbitrary assignment of risk." *Id.*

Negotiators for Amtrak raised their concern about the operation of BN's safety program. Tr. 574–77. Indeed, during the first negotiation session in December 1971, Amtrak expressed its position that it could not accept a full indemnification formula because it had no control over railroad personnel or railroad safety equipment and programs. Tr. 571–72, 574; Joint Exh. 10 at 2, 5. Such a formula would force Amtrak to rely upon railroad management for control over personnel behavior and safety practices. *Id.* In February of 1972, during the second negotiation session, representatives of Amtrak expressed the need to consider how Amtrak might be given control and exert control over safety matters and railroad employees. Tr. 574; Joint Exh. 12 at 7–8. In response, BN negotiators stated that Amtrak should assume the hazards of operation if BN performed the operations safely and prudently. Tr. 575–76; Joint Exh. 10 at 8, 10. BN representatives then explained in detail the railroad's safety department policies, crew education program, safety rules, accident prevention techniques, post-accident corrective measures taken as a preventative measure, the trainmaster's role, and safety equipment, including speed signals and safety signals. Tr. 575–76; Joint Exh. 10 at 8, 11.

Amtrak and BN reached agreement on a permanent replacement to the original section 7.2 in the Basic Agreement, executing the Supplemental Agreement on May 15, 1972. Stipulation filed November 5, 1987, ¶ 7. The effectiveness of the Supplemental Agreement between Amtrak and BN was contingent upon the execution of substantively identical agreements with Amtrak by a specified percent of the other freight railroads. *Id.;* Tr. 153–54, 183–84.

The new section 7.2 provided:

(a) NRPC agrees to indemnify and save harmless Railroad, irrespective of any negligence or fault of Railroad, its employees, agents or servants, or howsoever the same shall occur or be caused, from any and all liability for injuries to or death of any employee of NRPC and for loss of, damage to, or destruction of his property; but it is expressly understood and agreed that labor furnished by Railroad for and on behalf of NRPC under any provision of this Agreement and for which Railroad bills NRPC under this Agreement shall not be regarded for the purposes of this Section 7.2(a) as employees of NRPC.

(b) NRPC agrees to indemnify and save harmless Railroad, irrespective of any negligence or fault of Railroad, its employees, agents or servants, or howsoever the same shall occur or be caused, from any and all liability for injuries to or death of any person or passenger who has purchased an NRPC-approved ticket for any train operated by or for the account of NRPC and for loss of, damage to or destruction of property of such person or passenger and for injuries to or death of any other person who may be on, getting on, or alighting from such train for the purpose of accompanying or meeting a passenger, and for loss of, damage to or destruction of the property of such person.

Agreements, Tab 2. Under similar provisions, BN agreed to indemnify Amtrak "irrespective of any negligence or fault of NRPC, its employees, agents or servants, or howsoever the same shall occur or be caused," for "any and all liability" arising from the injury or death of BN's employees and any other person other than Amtrak passengers, employees or persons injured or killed at grade crossings. Agreements, Tab 2, § 7.2(e). Amtrak agreed to pay BN 3.67 cents per train mile for each Amtrak train operated over the lines of BN, in consideration for the liability assumed by BN. Agreements, Tab 2, § 7.2(f). The agreement did not mention gross negligence, willful or wanton misconduct, recklessness, or punitive damages.

Amtrak transmitted the new section 7.2 to each of the other freight railroads. Mr. Medvecky met with each railroad, inviting each to sign a substantially similar agreement and to discuss any questions they might have with the agreement. Tr. 154–57. Mr. Medvecky offered to provide written clarification and interpretation by way of side letters to those railroads who raised significant questions. *Id.;* Stipulation filed November 5, 1987, ¶ 8.

The Atchison, Topeka & Santa Fe Railroad ("Santa Fe") was among the railroads with which Amtrak sought to execute the Supplemental Agreement. On March 31, 1972, Mr. Medvecky wrote to Richard Knowlton, the assistant general counsel at Santa Fe, enclosing a copy of the agreement Amtrak had executed with BN, and proposing that the Santa Fe execute a similar agreement. Tr. 159–60; Joint Exh. 14. Mr. Medvecky disabused the representatives of the Santa Fe of the notion that they would have a *de novo* negotiation concerning the liability agreement. Tr. 160; Conrail Knowlton designation 41–42; Amtrak Knowlton counterdesignation 10–11. At a meeting in Chicago between Mr. Medvecky and Mr. Knowlton, the proposed Amtrak Santa Fe agreement was discussed. Tr. 160; Conrail Knowlton designation 43. On May 11, 1972, Amtrak and Santa Fe executed substantially the same agreement amending section 7.2 that had been agreed to by BN. Tr. 162; Agreements, Tab 4. The agreement does not mention gross negligence, willful or wanton misconduct, recklessness, or punitive damages. Agreements, Tab 4.

Mr. Medvecky provided a side letter to Mr. Knowlton, on May 24, 1972, which reflects no question or discussion of gross negligence, willful or wanton misconduct, recklessness, or punitive damages. Agreements, Tab 6. Mr. Knowlton has no specific recollection of any of the discussions or negotiations concerning the 1972 supplemental liability agreement, nor does he recall any discussions about liability for heightened levels of negligence. Amtrak Knowlton designation 9–15. Mr. Knowlton believes that, to illustrate the agreement under the amendment to section 7.2, he and

Amtrak negotiators used the hypothetical example of an accident caused by a "drunken engineer." Knowlton Affidavit ¶ 5, Joint Exh. 106; Conrail Knowlton designation 58–59. But Mr. Knowlton cannot specifically state that such a conversation actually took place, nor does he recall any of the circumstances of the conversation. Amtrak Knowlton designation 17–19. Mr. Medvecky testified that, to the best of his recollection, Mr. Knowlton did not discuss any hypothetical drunken engineer with him. Tr. 165. The Court cannot find that there was any discussion of a drunken engineer between Amtrak negotiators and those representatives of Santa Fe.

In a similar fashion as with the Santa Fe, Mr. Medvecky transmitted a copy of the proposed Supplemental Agreement to Mr. Brinkworth, then general counsel for Penn Central, inviting Penn Central to enter the same agreement. Tr. 505. In April of 1972, Mr. Brinkworth met with Mr. Medvecky to discuss the amendment of section 7.2. Tr. 510. At that meeting, Mr. Medvecky made it clear that each freight railroad was required to execute the same agreement that had been reached with BN. Tr. 155–56, 510. Mr. Brinkworth did not ask Mr. Medvecky about what the language in the Supplemental Agreement concerning negligence or fault meant, but Mr. Brinkworth believed that the language was broad. Tr. 511–12.

On June 1, 1972, Mr. Medvecky provided a side letter to Penn Central at Mr. Brinkworth's request. Tr. 512–13; Agreements, Tab 5. Mr. Brinkworth had asked for a clarification of the circumstances under which Penn Central would be indemnified by Amtrak under the new section 7.2. Tr. at 512. Mr. Brinkworth did not ask nor does the side letter reflect any question about gross negligence, recklessness, willful or wanton misconduct, or misconduct warranting punitive damages. Tr. 675–76; Agreements Tab 5. Nor did Mr. Brinkworth and Mr. Medvecky discuss the subjects of gross negligence, willful or wanton misconduct, recklessness, or punitive damages in connection with the proposed Supplemental Agreement. Tr. 675–77.

On June 1, 1972, Amtrak and Penn Central agreed to a new section 7.2 of the Basic Agreement between Amtrak and Penn Central, Tab 3, identical to that which had been agreed upon by Amtrak with BN and Santa Fe. Agreements, Tab 3. The agreement itself makes no mention of gross negligence, willful or wanton misconduct, recklessness, or punitive damages, nor is there any documentation reflecting discussions of those subjects in negotiating the Supplemental Agreement. Id.; Tr. 676.

By July 1, 1972, the other freight railroads that chose to had entered into an agreement with Amtrak that was substantively identical to the Amtrak BN agreement. Stipulation filed November 5, 1987, ¶ 8. Amtrak and the freight railroads dealt with matters of interpretation by means of side letters issued shortly after the various agreements were executed. Id. Each side letter responded to those concerns raised by the particular railroad. Id. Just as with the agreements of BN, the Santa Fe, and Penn Central, none of the supplemental agreements with the other railroads specifically addresses gross negligence, willful or wanton misconduct, recklessness, intentional misconduct or punitive damages, nor is there evidence that these subjects were discussed. Tr. 165–66.

2. 1976 Negotiations

Between 1972 and 1976, when Conrail assumed the freight operations of Penn Central, there were no substantive changes made in the liability apportionment provisions. Tr. 583; Stipulation filed November 5, 1987, ¶ 9. On April 1, 1976, the rail properties comprising the Northeast Corridor were transferred from Penn Central, through Conrail as a conduit, to Amtrak. Brinkworth Affidavit ¶ 13; Joint Exh. 104. Concurrently with the execution of the purchase agreement, dated April 1, 1976, which transferred the Northeast Corridor to Amtrak, Conrail and Amtrak entered into six agreements governing the operation of the Northeast Corridor and Amtrak's intercity passenger service on Conrail's off-corridor rail properties. Stipulation filed November 5, 1987, ¶ 10. Those operating agreements were: 1) the North-

east Corridor Freight Operating Agreement; 2) the Maintenance of Commuter Equipment Service Agreement; 3) the Maintenance of Freight Equipment Service Agreement; 4) the Northeast Corridor Management Agreement; 5) the Northeast Corridor Commuter Operating Agreement; and, 6) the Off–Corridor Operating Agreement. *Id.;* Agreements Tabs 7-12. Each of these agreements contained liability apportionment provisions. Stipulation filed November 5, 1987, ¶ 10. The Northeast Corridor Freight Operating Agreement governed Conrail's freight operations on the Northeast Corridor tracks owned by Amtrak. *Id.* ¶ 11. The language of the liability apportionment provisions contained in all of the 1976 agreements tracks the language of the amended section 7.2 that was agreed to in 1972. Tr. 282. It is noted that Section 2.2(d) of the Freight Operating Agreement requires Conrail to adhere to Amtrak's safety rules.

Safety provisions were discussed by the parties from time to time. Amtrak insisted that its safety and operating rules be followed by Conrail in its utilization of Amtrak's trackage in the Corridor. Ultimately, Conrail agreed and Section 2.2(d) was adopted, which states that any services performed by Conrail that involve responsibility for the handling or movement of any trains over the Northeast Corridor "shall be governed by and subject to all the current operating and safety rules, orders, procedures and standards of Amtrak with respect thereto."

Amtrak's negotiators for the 1976 agreements were T. Page Sharp, Amtrak's associate general counsel, and Donald G. Avery, Amtrak's assistant general counsel. Tr. 194, 273, 422. The primary negotiators for Conrail were Donald A. Brinkworth, then assistant general counsel to Penn Central, on assignment to Conrail, and Elam M. Hitchner of Pepper, Hamilton & Scheetz, Conrail's outside counsel. Tr. 196, 283, 420-21. Negotiations began in early January when it was agreed that the Off–Corridor Agreement would be essentially a continuation of the 1971 Basic Agreement, including amended section 7.2, the Supplemental Agreement. Tr. 203-04, 283, 423.

Because the agreement had to be in place by April 1, 1976, the negotiation sessions accelerated rapidly during the month of March, routinely lasting 10 to 14 hours each day, sometimes going around the clock. Tr. 196, 199, 276, 283, 298, 426. Unlike the Off–Corridor Agreement, the 1976 Freight Operating Agreement had no preexisting model from which to draw its provisions. Tr. 197, 286. As a result, approximately half of the negotiations centered on the 1976 Freight Operating Agreement. *Id.*

Mr. Avery drafted the liability apportionment provisions for the 1976 Freight Operating Agreement, using section 7.2 of the Supplemental Agreement to the Basic Agreement as the "starting point." Tr. 203-05, 422-23, 591. The parties created a "mirror image" to the preexisting provisions of section 7.2 to be applicable to Conrail's operations over Amtrak's lines. Tr. 204, 217; Joint Exh. 101. Mr. Sharp had determined that the basic liability provisions would not be changed, and that they would "stick exactly with what we had" under the 1972 Supplemental Agreement. Tr. 275–76. Indeed, Mr. Sharp had been instructed not to change the liability provisions. Tr. 302. As a result, the key language from the 1972 agreement ("irrespective of any negligence or fault," "howsoever the same shall occur or be caused," "and any and all liability"), was incorporated verbatim into the 1976 agreement. Tr. 250–52; Joint Exh. 101.

The only substantive discussion of liability apportionment in the 1976 negotiations was a brief exchange that took place sometime between March 22 and 28, 1976. Tr. 202, 287, 432, 454, 591, 596; Joint Exhs. 21, 23, 24, 25, 27. During the exchange, Mr. Avery raised a hypothetical train explosion so severe that it would destroy a city block in downtown Philadelphia. Mr. Avery maintained that Amtrak should not bear any liability for damages that occurred off of the right of way on account of Conrail's freight operations. Tr. 223–25; Joint Exh. 23. He was concerned that section 6.1 of the proposed Freight Operating Agreement as it was drafted would impose liability for

damages for such a hypothetical train explosion on Amtrak. Mr. Avery proposed and Conrail accepted a change that departed from the basic liability provisions that preexisted these negotiations. Tr. 225; Joint Exh. 25; Agreements Tab 7.

According to Mr. Hitchner, he raised the concern during this brief exchange that the language in the indemnification provision was not sufficiently broad to cover gross negligence or willful or wanton conduct, because he had recently read a Pennsylvania case in which gross negligence or willful misconduct would not be covered by using the word negligence. Tr. 436–37, 439, 445–46. He believes that he suggested incorporating a clause along the lines of "including but not limited to," with reference to types of conduct in excess of negligence. Tr. 437, 444, 445. Mr. Hitchner recalled that Mr. Sharp told him that the language was sufficiently broad to cover Mr. Hitchner's concerns, and that no changes would be made because of potential problems with Amtrak's agreements with other railroads. Tr. 448. Both Mr. Sharp and Mr. Brinkworth recall that Mr. Hitchner raised the idea of broadening the liability provisions to make the language more explicit so that Amtrak would be liable for any of its passengers and employees under any circumstances, but that the idea was not adopted. Tr. 287–88, 592, 686. Mr. Sharp refused to change the indemnification provision, and testified that his position was "absolute in his mind." Tr. 276. Mr. Sharp does not recall any discussion about punitive damages or willful and wanton conduct, nor did he believe that the indemnification provision should be broad enough to cover any type of misconduct. Tr. 293–94. Mr. Brinkworth testified that he informed Mr. Hitchner that he believed the liability provisions to be broad enough to cover all degrees of negligence. Tr. 688. Mr. Brinkworth does not recall Mr. Sharp using the terms gross negligence, willful or wanton conduct, or recklessness, or inten-

tional conduct. Tr. 688–89. Mr. Brinkworth has no recollection of anyone mentioning punitive damages during this exchange. Tr. 689.

Similarly, Mr. Avery has no recollection of anyone discussing liability apportionment for punitive damages, recklessness, willful or wanton misconduct, or gross negligence during the 1976 negotiations. Tr. 244. Mr. Avery prepared two written reports in March of 1976, summarizing the status of the negotiations, the open issues, the resolved issues, and how they had been resolved for distribution to senior Amtrak management. Tr. 237–38; Joint Exhs. 24, 27. These reports do not reflect any discussions about broadening the liability apportionment provision. Joint Exhs. 24, 27. None of the principal negotiators of the 1976 agreements—Avery, Sharp, Hitchner, Brinkworth—recalls any discussion of punitive damages or intentional misconduct during the one negotiation concerning liability. Tr. 244, 249–50, 291–93, 457–58, 689.

But the hypothetical drunken engineer reared his ugly head again during this brief exchange. Mr. Brinkworth raised the hypothetical accident caused by a drunken engineer, believing in his own mind that the example represented more than ordinary negligence, but not stating that belief to the other negotiators. Tr. 597–98. Mr. Sharp, on the other hand, believed that the hypothetical drunken engineer represented an example of negligence, not of aggravated negligence or recklessness or intentional misconduct. Tr. 300, 303. For that reason, Mr. Sharp told Mr. Brinkworth that, in his opinion, an accident caused by a drunken Conrail engineer would be covered by the indemnification provision. Tr. 300.[4] Both Mr. Hitchner and Mr. Brinkworth conceded that, depending on the circumstances, a drunken engineer situation might be subject to liability for varying degrees of culpability. Tr. 452, 710–12.

---

4. Mr. Brinkworth testified that in 1971 when discussing the hypothetical drunken engineer with Mr. Wyatt, counsel for Amtrak's incorporators, Mr. Wyatt said that Amtrak would not indemnify Conrail for any drunken engineer.

Transcript 704. Mr. Brinkworth did not disclose the contents of the discussion of the drunken engineer back in 1971 with the negotiators in 1976. Transcript 704–05.

The discussion concerning broadening the indemnification provision was not reported by the negotiators on behalf of Amtrak or on behalf of Conrail to their superiors. Tr. 292, 455–56. Nor is there written confirmation of the conversation concerning broadening the indemnification provision or even concerning the hypothetical of the drunken engineer. Tr. 292–93, 470–71, 689. The Court finds that, although some discussion of broadening the indemnification provisions took place in 1976, there was no meeting of the minds concerning the intent of the parties to indemnify occurrences of more than mere negligence or for awards of punitive damages. Indeed, the side letter provided by Amtrak negotiators at Mr. Brinkworth's request to Conrail after the 1976 negotiations did not mention or reflect any agreement concerning gross negligence, recklessness, willful or wanton misconduct, or punitive damages. Tr. 691; Joint Exhs. 26, 28. Had Mr. Brinkworth asked for the side letter to address those issues, Amtrak lawyers would have presented the questions to senior Amtrak management for resolution. Tr. 248–49.

The 1976 Freight Operating Agreement was executed April 1, 1976 between Conrail and Amtrak. Stipulation filed November 5, 1987, ¶ 10. Section 6.1(e) of the 1976 Freight Operating Agreement provides:

> Amtrak agrees to indemnify and save harmless ConRail, irrespective of any negligence or fault of ConRail, its agents, employees or servants, or howsoever the same shall occur or be caused, from any and all liability for injury to or death of any employee or employees of Amtrak and for loss of, damage to or destruction of any property or equipment owned by, leased to, used by, or otherwise in the control, custody or possession of Amtrak or its employees, ... which arises from activities conducted by or for the account of ConRail pursuant to this Agreement....

Agreements, Tab 7, section 6.1(e). In section 6.1(f), Amtrak and Conrail agreed that:

> Amtrak agrees to indemnify and save harmless ConRail, irrespective of any negligence or fault of ConRail, its employees, agents or servants, or howsoever the same shall occur or be caused, from any and all liability for injury to or death of any person or persons (other than those persons, employees or passengers described in Section 6.1(a), 6.1(b) and 6.1(d) hereof) ... which arises from activities conducted by or for the account of ConRail pursuant to this Agreement.

Agreements, Tab 7, section 6.1(f).

Under similar provisions, Conrail agreed to indemnify Amtrak "irrespective of any negligence or fault of Amtrak, its employees, agents or servants, or howsoever the same shall occur or be caused," from "any and all liability" arising from the injury or death of Conrail employees (section 6.1(a)), and from damage to Conrail's locomotives, railroad cars and other property (section 6.1(c)). Conrail also agreed to indemnify Amtrak's injuries to Conrail passengers, in section 6.1(b), which provides:

> ConRail agrees to indemnify and save harmless Amtrak, irrespective of any negligence or fault of Amtrak, its employees, agents or servants or howsoever the same shall occur or be caused, from any and all liability for injury to or death of any person or passenger (other than employees or agents of Amtrak arising pursuant to Section 6.3(a) hereof), who has purchased tickets for or is riding on any train operated by or for the account of ConRail (other than trains operated for the account of Amtrak) and for loss of, damage to or destruction of property of such person or passenger or for injuries to or death of any other person who may be on, getting on, or alighting from such train for the purpose of accompanying or meeting a ConRail passenger, and for loss of, damage to or destruction of the property of such person, and for loss of, damage to or destruction of freight or lading on any such train.

Agreements, Tab 7, section 6.1(b).

### 3. 1979 Negotiations

No changes were made to the liability apportionment provisions of the Northeast Corridor Freight Operating Agreement between the time that the agreement was executed in 1976 through June 19, 1979,

when Amtrak and Conrail executed the Liability Apportionment Agreement (effective as of October 1, 1978). Stipulation filed November 5, 1987, ¶ 12. The Liability Apportionment Agreement collected the existing liability apportionment provisions and several of the operating agreements between Amtrak and Conrail, including the Northeast Corridor Freight Operating Agreement, into a single agreement. *Id.;* Tr. 312, 332, 605–06; Agreements, Tab 17.

Amtrak's chief negotiator for the Liability Apportionment Agreement was James L. Larson, who focused on compensation issues. Tr. 330–31. Mr. Avery was responsible for the negotiations and discussions of the liability provisions and drafted the contract language on behalf of Amtrak. *Id.* Mr. Brinkworth and Mr. Hitchner represented Conrail in the 1979 negotiations. Tr. 330, 606–07. Both Mr. Larson and Mr. Brinkworth attended all of the negotiation sessions for the 1979 Liability Apportionment Agreement. Tr. 330–31, 606–07. As the Liability Apportionment Agreement was intended to be a compilation of liability provisions, and not to effect a substantive change in the liability apportionment negotiated in 1976, no substantive changes were made in the liability apportionment arrangements in connection with the 1979 negotiations. Stipulation filed November 5, 1987 ¶ 12; Tr. 607–08, 755–56. During the 1979 discussions of the Liability Apportionment Agreement, terms such as gross negligence, reckless, willful or wanton misconduct, or punitive damages, and the ubiquitous hypothetical drunken engineer were not raised. Tr. 332–33, 378, 618, 694, 756.

#### 4. 1982 Negotiations

On December 22, 1982, Amtrak and Conrail executed an amendment to the 1979 Liability Apportionment Agreement to be effective January 1, 1983. Stipulation filed November 5, 1987 ¶ 13. As in the 1979 discussions, issues of gross negligence, willful, wanton or reckless misconduct, punitive damages and the drunken engineer were not raised. Tr. 378, 667–69, 694; Agreements, Tab 18.

#### 5. 1983 Negotiations

Effective October 1, 1983, Amtrak and Conrail entered into the First Amended and Restated Northeast Corridor Freight Operating Agreement. Stipulation filed November 5, 1987 ¶ 14. At the time of the 1983 agreement's execution, the liability apportionment provisions applicable to Conrail's freight operations on the Northeast Corridor were contained in the Liability Apportionment Agreement and its amendment. *Id.* The 1983 First Amended and Restated Northeast Corridor Freight Operating Agreement did not make any change in existing liability apportionment provisions. *Id.;* Tr. 334, 620–21, 757–58. The primary objective of the parties in 1983 was to amend the compensation provisions of the 1976 Freight Operating Agreement. Tr. 334, 620–21, 756–57; Agreements, Tab 20. Mr. Larson served as Amtrak's chief negotiator, assisted by Frederick C. Ohly as counsel and Ron Jefferson of Amtrak's finance department. Tr. 333. For Conrail, Mr. Brinkworth and Mr. Hitchner served as principal negotiators. Tr. 333. At no time during the negotiations of the 1983 Freight Operating Agreement did the parties discuss liability apportionment, degrees of culpability, punitive damages or a drunken engineer. Tr. 334, 345, 378, 459–60, 757–58, 620–21, 694.

#### 6. 1986 Negotiations

Effective October 1, 1986, Amtrak and Conrail entered into the Second Amended and Restated Northeast Corridor Freight Operating Agreement. Stipulation filed November 5, 1987, ¶ 15; Tr. 396; Agreements, Tab 22. That agreement did contain indemnification provisions that were changed from those found in the 1979 agreement. *Id.* However, the provisions concerning responsibility for injury to Amtrak passengers remained unchanged. Tr. 766.

Principally involved in the negotiation of the 1986 Freight Operating Agreement on behalf of Conrail were Mr. Brinkworth, then General Counsel–Litigation for Conrail, and Mr. Hitchner. Tr. 335. Negotiators on behalf of Amtrak were Frederick C. Ohly, Associate General Counsel, and

James L. Larson, Assistant Vice President–Contract Administration. Tr. 335. The negotiations arose after Congress changed the compensation standard governing Conrail's presence on the Northeast Corridor from an avoidable cost basis to an allocated cost basis, giving Amtrak a more favorable basis for compensation. 45 U.S.C. § 562(a); Tr. 27, 371–72. These negotiations were held over a period of several months during the spring and fall of 1986. Tr. 335. Both Mr. Larson and Mr. Ohly attended all the 1986 negotiation sessions, with Larson's primary concern the compensation provision and Ohly's responsibility to draft the agreement and negotiate the liability apportionment provision. Tr. 335, 361–62, 372. Due to the statutory change, the subject of compensation was the major issue in these negotiations, taking 90 to 95 percent of the negotiators' time. Tr. 373–74, 634–35. Because the parties initially failed to reach an agreement on the compensation issue, Amtrak commenced a proceeding before the Interstate Commerce Commission ("the Commission") seeking a solution to the question of compensation. Tr. 374. Pursuant to the contract, Amtrak gave Conrail notice that it wanted to reopen the compensation provisions of the Freight Operating Agreement for negotiation. Tr. 635; *see* Agreements, Tab 20 section 3.8. Thereafter, negotiations resumed, culminating in an agreement on the principal issue of compensation for Conrail's use of the Northeast Corridor. Tr. 34.

The discussions concerning liability apportionment covered such risks as electrocutions, hazardous materials, maintenance of some freight tracks, and Amtrak employee injury additives, and injury to Amtrak's passengers. Tr. 34, 374, 636–38. Several hours were spent discussing the issues of electrocutions and hazardous materials, and ultimately, changes favorable to Amtrak were made with respect to those risks. Tr. 375–76, 334–35. Conrail agreed to accept the risk of liability arising from hazardous or toxic materials carried in Conrail trains on the Northeast Corridor. Agreements, Tab 22 § 5.12. Conrail also agreed to accept one-half of the exposure to liability for injuries or deaths of third parties coming in contact with Amtrak's electric catenary wires after climbing upon Conrail equipment. *Id.* § 5.11. Although Amtrak raised a proposal to shift liability for passenger injuries to Conrail, these discussions were limited, and Amtrak ultimately dropped the issue because of Conrail's total unwillingness to discuss that category of liability. Tr. 345–46, 376, 460, 638, 762–63. Conrail also rejected Amtrak's proposal of reducing the term of the new agreement from five years to three years so that the issue of shifting liability for passengers could be reopened sooner. Tr. 377, 394–95.

As with previous discussions and negotiations between Amtrak and Conrail over the course of fifteen years, no one mentioned gross negligence, recklessness, willful or wanton misconduct or punitive damages. Tr. 336, 356–57, 378–79, 692. Unlike in previous years, Conrail did not request a side letter interpreting the 1986 agreement. Tr. 693. Only the Conrail negotiators recall any discussion of the hypothetical drunken engineer during the 1986 negotiations. Tr. 61, 641–42, 764. Neither Mr. Hitchner nor Mr. Brinkworth recalls who raised the drunken engineer hypothetical or in what context it had arisen. Tr. These vague recollections of the hypothetical drunken engineer afford no basis for finding that the parties mutually and unequivocally intended the indemnification provisions to cover gross negligence or wanton, willful, or reckless misconduct, or punitive damages.

B. *Other Evidence*

1. Amtrak's Position: Public Statements and In–House Discussions

W. Graham Claytor, Jr. became the Chairman and Chief Executive of Amtrak on July 2, 1982. Tr. 8. In the summer of 1984, Mr. Claytor discussed the scope of Amtrak's indemnity agreements with Paul F. Mickey, Jr., Executive Vice President–Law and Public Affairs, in the context of nine serious accidents that had occurred in close succession. Tr. Mr. Mickey suggested to Mr. Claytor and his predecessor that

Amtrak could successfully take the position that it was not obligated to indemnify the railroads for intentional or willful misconduct or other aggravated conduct that constituted more than mere negligence. Tr. 53, 78–81. Mr. Claytor determined that Amtrak would take the position that Amtrak was not obligated to indemnify the freight railroads for damages accruing from gross negligence or aggravated misconduct. Tr. 14–15, 52–53.

In July of 1984, Mr. Claytor expressed the opinion in testimony before Congress that in his opinion Amtrak was not required to indemnify other railroads for accidents caused by those railroads' gross negligence. Tr. 20, 22–23; Joint Exh. 49, p. 56; Joint Exh. 50, pp. 126–27. He testified before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, Science and Transportation that he was "not happy about the rare case in which you may have gross negligence on the part of the railroad that causes an accident and have [Amtrak] pay for almost the whole thing," adding that Amtrak might be able to obtain an interpretation of the existing contract to "provide that exception." Joint Exh. 49, p. 56. Before the Subcommittee on Transportation, Aviation and Materials of the House Committee on Science and Technology, Mr. Claytor testified that "in the event of a derailment or any accident, Amtrak pays all the costs of damage to its equipment and liability to its passengers," characterizing the indemnification provisions as a "no-fault scheme" designed to avoid "endless and erratic litigation to determine fault." Joint Exh. 50, pp. 126–27. He further testified that Amtrak was "looking into the feasibility of interpreting the contract in such a way ...

in the case of flagrant or gross negligence on the part of the railroads." *Id.* at 126.

Throughout the 1986 negotiations, Amtrak's chief legal counsel, Frederick C. Ohly, was aware of Mr. Claytor's testimony before Congress, but did not bring the subject up with Conrail. Tr. 393. Mr. Ohly understood that Amtrak considered taking the position, "if a situation arose," that the agreements did not apply to gross negligence. Tr. 392–93. Mr. Claytor never instructed Amtrak's negotiators to advise Conrail of his interpretation of the indemnification agreements. Tr. 58. Nothing in the record reflects Conrail's awareness of this testimony or interpretation. Tr. 393, 644, 766.

By letter of June 20, 1984, Mr. Ohly identified to Conrail several categories of accidents for which Amtrak believed changes to the indemnification provisions in the 1979 agreement were in order. Tr. 363–64, 383; Joint Exh. 48.[5] Among issues covered in the June 20, 1983 letter are electrocutions by catenary wires of trespassers who climb onto freight equipment, cleanup of hazardous material spills resulting from accidents involving Conrail trains, maintenance of tracks in the event of accidents or damage to the track, and payments for injury or death to Amtrak employees that would be attributed to Conrail's presence on the Northeast Corridor. Tr. 363–64; Joint Exh. 48. Amtrak sought to have Conrail "assume complete responsibility" for electrocutions because "the magnitude of the liability associated with it is unique." Joint Exh. 48, pp. 4–5. Amtrak had discussed internally the question of liability for electrocutions of trespassers who climbed on parked Conrail freight equipment and touched the electric cate-

---

**5.** Mr. Ohly described the existing indemnification provisions in the following manner:

> The Agreement currently provides for an apportionment between the parties, without regard to fault, of the risks of liability (and damages) arising in connection with Conrail freight operations on the Corridor. The Agreement establishes basically the same apportionment that is applicable to Amtrak operations on Conrail property outside the NEC (and to Amtrak's operations on freight railroads throughout the country). Under the

> Agreement, Amtrak as the owning railroad is responsible for liability with respect to Amtrak employees, passengers, equipment, and the right of way, as well as injury to third parties on the right of way, without regard to fault or causation. The Agreement currently provides that Conrail shall pay Amtrak one percent of total billings under the Freight Operating Agreement as compensation to Amtrak for this risk of liability.

> Joint Exh. 48, p. 3.

nary wires. Tr. 97–98; Joint Exh. 44. One internal Amtrak memorandum from Charles Mandolia to Paul Mickey, Jr. suggested that Amtrak should not be subjected to liability for these electrocutions because Amtrak had spent substantial sums for preventative measures such as fencing and police protection. *Id.* Mr. Mickey believed that the electrocution accidents were not examples of reckless, willful or wanton misconduct or conduct warranting punitive damages. Tr. 95–96. Mr. Mickey understood that Mr. Mandolia was concerned about the potential for large jury verdicts in "electrocution cases where typically a minor is suing a large corporation [and has] a tremendous potential for upsetting a jury." Tr. 96. Amtrak never received a formal or substantive response to Mr. Ohly's June 20, 1983 letter to Conrail, nor was there much discussion about the issues raised by the letter. Tr. 367–68.

Months after he testified before Congress, Mr. Claytor focused specifically on Amtrak's indemnity agreements with Conrail. Tr. 27–28. Mr. Claytor believed that because Conrail was using Amtrak's Northeast Corridor, Conrail should fully indemnify Amtrak for injuries to Amtrak passengers arising out of the Northeast Corridor. Tr. 27–28. His desire to change the apportionment provisions had no relationship to gross negligence or reckless conduct, but was premised on the belief that Amtrak should rid itself of any obligation. Tr. 28–29. On February 5, 1985, Mr. Claytor expressed his concern to Mr. Ohly about Amtrak's responsibility for injuries to Amtrak passengers arising out of Conrail's operations on the Northeast Corridor. Tr. 369, 391; Joint Exh. 55. It was the first time that Mr. Claytor had expressed such a very strong level of concern about the indemnification arrangements. Tr. 391.

On February 8, 1985, Amtrak notified Conrail of its intention to raise an amendment to the Liability Apportionment Agreement. Joint Exh. 57. The proposed amendment would provide that in the event of an accident on the Northeast Corridor involving Conrail and Amtrak trains, the two railroads would share in passenger liability. *Id.* Mr. Brinkworth of Conrail responded that there was no hope for the proposal because Conrail would not agree to change the liability apportionment provisions insofar as passengers were concerned. Tr. 632.

In early April of 1985, Mr. Ohly wrote to Mr. Brinkworth to propose the renegotiations of the existing agreements "to include provisions that will reasonably cover the entire additional risk to which Amtrak is exposed as a consequence of Conrail's NEC freight operations." Tr. 368; Joint Exh. 58, p. 2. Amtrak proposed alternatives ranging from full indemnification by Conrail to a "carefully defined, limited Conrail liability with respect to certain passenger injuries." Joint Exh. 58, pp. 2–3. This letter was prompted by the concerns raised by Mr. Claytor about the risk Amtrak faced by virtue of Conrail's presence on the Northeast Corridor. Tr. 368–69, 374–75. Noting that "Conrail currently has no responsibility for costs that Amtrak incurs for injury to its passengers," Mr. Ohly informed Mr. Brinkworth that Amtrak would seek relief from the risk of this liability "either through a change in the risk apportionment or by agreement upon compensation to cover the cost of the liability exposure for which Amtrak accepts responsibility." Joint Exh. 58, p. 2.

### 2. Insurance Coverage

Throughout the period of time from the execution of the Supplemental Agreement amending Section 7.2 of the Basic Agreement between Amtrak and the nation's freight railroads in 1972, through October 1, 1986, Amtrak's insurance policies indemnified Amtrak for any and all sums which Amtrak might become legally liable or obligated by contract to pay as compensation or damages for injury to any person or persons and for damage to property arising out of any of Amtrak's operations within continental North America. Stipulation filed November 19, 1987, ¶ 1.

During this period of time, these insurance policies also provided that all railroads except Burlington Northern with whom Amtrak entered into operating agreements were added as Additional Assureds with

respect to any liabilities assumed by Amtrak under such agreements. *Id.* ¶ 2.

During this period of time, these insurance policies specifically provided that personal injury caused by eviction from trains or assault by an employee of Amtrak or an employee of a railroad or third party providing services to Amtrak or for the account of Amtrak was deemed covered, provided that the assault was not committed at the specific instance or direction of Amtrak. *Id.* ¶ 3.

Amtrak's insurance coverage was subject to conditions, limits and exclusions as specified in the applicable policy. *Id.* ¶ 4. The conditions, limits and exclusions as specified in the policies generally apply in the same way to coverage for Amtrak's liability by contract as they apply to coverage for Amtrak's liability growing out of Amtrak operations. *Id.* Beginning October 1, 1984, coverage for punitive damages was partially excluded. As of October 1, 1985, punitive damages were totally excluded from coverage. *Id.*; Tr. 66.

As of October 1, 1986, Amtrak elected not to renew its insurance for the first $50,000,000 of coverage. Tr. 31–32. Instead, Amtrak decided to self-insure this risk by establishing an insurance reserve account into which it would deposit the funds which it would otherwise pay as insurance premiums, until the reserve was adequate to cover its increased risk retention. Joint Exh. 70. As Amtrak described this decision in September, 1986:

> We recognize that this course of action entails some short-term risk of a major loss before the reserve is fully funded. We believe this risk to be manageable since experience shows that major losses always entail litigation and seldom settle short of three or four years after occurrence.

*Id.*

### 3. The MBTA Contract

In May 1985, Amtrak entered into an agreement with the Massachusetts Bay Transportation Authority ("MBTA"), dated July 1, 1984. Joint Exh. 108. Like the indemnification provisions at issue here, the MBTA agreement contains liability apportionment provisions allocating liability for certain categories of liability "irrespective of negligence or fault." *Id.* at 13–14. Unlike the indemnification agreement between Conrail and Amtrak, the MBTA agreement expressly excludes willful, wanton or reckless misconduct from coverage, providing:

> Notwithstanding the foregoing apportionment of risk of liability, neither party shall indemnify or waive any claims against the other party for injury or damage of any kind that is caused by the willful, wanton, or reckless acts or omissions of the other party (including its officers, employees, and agents).

*Id.* at 14.

The MBTA agreement was negotiated by Mr. Mickey, Amtrak's Vice President and General Counsel, and by Mr. Ohly, Amtrak's chief legal counsel in the 1986 negotiations with Conrail. Tr. 103.

### C. Summary of Findings

None of the indemnification agreements between Amtrak and Conrail, or its predecessor, Penn Central, from 1972 to the present expressly refers to gross negligence, recklessness, willful or wanton misconduct or conduct that warrants the imposition of punitive damages. *See* Agreements, Tabs 1, 3, 7–13, 17–18, 22. Neither do side letters provided to the defendant in this case by Amtrak mention these aggravated types of misconduct. *See* Agreements, Tab 5. Nor do drafts of the agreements reflect any negotiation with respect to indemnification for those forms of misconduct. *See, e.g.,* Joint Exhs. 21, 23, 25. Furthermore, Conrail presented no internal documentation concerning how the indemnification provisions apply to cases of gross negligence, recklessness, willful or wanton misconduct or awards of punitive damages. Additionally, the documents pertaining to Amtrak's various negotiations with the AAR subcommittee, Burlington Northern, and the Santa Fe lack any references to the treatment of gross negligence, recklessness, willful or wanton conduct or punitive damages under the indemnification provi-

sions. The Court finds that no documentary evidence supports Conrail's position that the parties intended the liability apportionment provisions to extend to reckless, willful or wanton misconduct, gross negligence, or conduct warranting the imposition of punitive damages.

Further, the Court is unable to find that the parties to this action discussed the treatment of aggravated misconduct or punitive damages under this agreement. Various witnesses have vague and conflicting recollections of discussions centered on the hypothetical drunken engineer and how an accident caused by this phantom would be treated under the indemnification provisions. The Court is unable to find on the basis of these recollections that both parties manifested any intent for the indemnification provisions to cover accidents caused by gross negligence, willful or wanton misconduct, recklessness, intentional misconduct, or punitive damages.

Throughout these negotiations, as reflected by testimony of the witnesses, it is apparent that Amtrak's representatives were deeply concerned about the maintenance of safety. This is reflected in what Mr. Wyatt, counsel for the Amtrak incorporators, told Mr. Brinkworth in 1971, to the effect that Amtrak would not indemnify Conrail for the actions of any drunken engineer. Tr. 704. Amtrak's representatives also insisted upon the inclusion of Section 2.2(d) respecting the obligation of Conrail to conform to Amtrak's safety rules. In each subsequent version of the Freight Operating Agreement, especially the version in force and effect at the time of the Chase, Maryland accident, the provision requiring Conrail to comply with Amtrak's safety and operating rules and procedures has

been retained. The Court finds that Conrail's representatives, including Mr. Brinkworth, were aware throughout these negotiations of Amtrak's concern with the necessity for following applicable safety rules and regulations. At all relevant times, Conrail and the freight railroads were aware that indemnification provisions comparable to the Liability Apportionment Agreement between Amtrak and Conrail were to be construed strictly and narrowly. In none of the agreements negotiated involving liability apportionment was any mention made of gross negligence, recklessness, willful or wanton misconduct or intentional misconduct or punitive damages. Conrail offered no documentation as to how cases involving gross negligence, recklessness, willful or wanton misconduct or punitive damages would be dealt with.

## III.  CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and the Declaratory Judgment Act, 28 U.S.C. § 2201. Venue is proper under 28 U.S.C. § 1391.

Under District of Columbia law, it is settled that contractual provisions may be invalidated when they are contrary to public policy.[6] *See Wisconsin Avenue Assoc. v. 2720 Wisconsin Avenue Cooperative Ass'n*, 441 A.2d 956, 964 (D.C.), *cert. denied*, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982). No cases in the District of Columbia specifically address the issue presented in this case, namely, whether a contract which is said to indemnify for gross negligence, reckless, wanton or willful misconduct or for conduct warranting the imposition of punitive damages is void

---

**6.** The Court previously held that the Freight Operating Agreement did not require the Court to submit this dispute to arbitration. *See Consolidated R. Corp. v. National R.R. Passenger Corp.*, 657 F.Supp. 405 (D.D.C.1987); *see also National R.R. Passenger Corp. v. Consolidated R. Corp.*, 670 F.Supp. 424, 426 n. 3 (D.D.C.1987). Since that time, Conrail has urged the Court to reconsider its decision in light of the Supreme Court's post-decision ruling in *United Paperworkers v. Misco, Inc.*, —— U.S. ——, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In *Misco*, the Supreme Court reversed a decision of the Fifth

Circuit setting aside an arbitrator's award on the ground that it violated public policy. The Supreme Court's holding in *Misco* turned on the Fifth Circuit's failure to ground its definition of public policy "by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* 108 S.Ct. at 374 (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). By comparison, the public policy interest identified in this case—indemnifying tortfeasors for their willful and wanton misconduct —is well-established in the case law.

on public policy grounds. In determining whether an indemnification provision offends public policy to the extent that it is *pro tanto* unenforceable, the Court must balance the weight of public policy considerations against the intentions of the parties to the contract. *Burtoff v. Burtoff,* 418 A.2d 1085, 1088–90 (D.C.1980); *Maryland–National Capital Park and Planning Commission v. Washington National Arena,* 282 Md. 588, 386 A.2d 1216, 1229 (1978); *see also* Restatement (Second) of Contracts § 178 (1981).

■ Contract provisions which appear to indemnify against willful, wanton, reckless, or intentional misconduct by the indemnitee are contrary to public policy. *Chicago, Rock Island & Pacific R.R. v. Chicago, Burlington & Quincy R.R.,* 437 F.2d 6, 10 (7th Cir.), *cert. denied,* 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971); *Inland Container Corp. v. Atlantic Coast Line R.R.,* 266 F.2d 857 (5th Cir.1959); *Alabama Great Southern R.R. v. Louisville & Nashville R.R.,* 224 F.2d 1, 4 (5th Cir.1955); *Thomas v. Atlantic Coast Line R.R.,* 201 F.2d 167, 170 (5th Cir.1953). Additionally, public policy will not sanction indemnification provisions that purport to shift the burden of paying punitive damages away from the tortfeasor.[7] *Northwestern Casualty Co. v. McNulty,* 307 F.2d 432, 440–41 (5th Cir.1962) (Wisdom, J.); *see also Hartford Life Insurance v. Title Guarantee Co.,* 520 F.2d 1170, 1175 (D.C.Cir.1975)

(stating that public policy bars liability insurance coverage where intentional or knowledgeable wrongdoing is at issue); *Salus Corp. v. Continental Casualty Co.,* 478 A.2d 1067, 1071–72 (D.C.1984) (suggesting that, while the duty to defend arises regardless of allegations of punitive damages, the duty to pay punitive damages may be contrary to public policy); *Pray v. Lockheed Aircraft Corp.,* 644 F.Supp. 1289, 1295 (D.D.C.1986) (suggesting that insurance coverage of punitive damages may be against public policy); *Curry v. Giant Food,* 522 A.2d 1283, 1290 (D.C. 1987) (acknowledging the *McNulty* rule).

Broad indemnification is particularly disfavored where the indemnitee's activities directly affect the public safety. *Northwest Airline, Inc. v. Alaska Airlines, Inc.,* 351 F.2d 253, 257–58 (9th Cir.1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1068, 15 L.Ed.2d 853 (1966); *Fairfax Gas & Supply Co. v. Hadary,* 151 F.2d 939, 940 (4th Cir. 1945); *Otis Elevator Co. v. Maryland Casualty Co.,* 95 Colo. 99, 33 P.2d 974, 977 (1934).

Congress has declared that the policy of the United States government in regulating the railroad industry, among other things, is to "promote a safe and efficient rail transportation system" and to "operate transportation facilities and equipment without detriment to the public health and safety." 49 U.S.C. § 10101a(3), (8). Addi-

---

7. Conrail argues that the recent decision of the federal district court in Maryland, which has jurisdiction over the personal injury suits filed as a result of this accident, renders this proceeding moot. In *In re Rail Collision Near Chase, Md. on Jan. 4, 1982 Litigation,* MDL No. 782 (D.Md. Sept. 9, 1988), the court held that the plaintiffs in that suit could not proceed on the theory that Conrail acted with a wanton disregard for human life, but they could present a claim that Conrail was liable for punitive damages due to the wanton conduct of its employees. Mem.Op. at 13, 16–20. Conrail contends that because it can be held liable for punitive damages only vicariously, not directly, there are no public policy concerns present in this case. In support of this claim, Conrail notes that several states that do not allow companies to insure themselves for their willful and wanton conduct nonetheless allow companies to insure themselves against vicarious liability for the willful and wanton conduct of their employees.

But the distinction between the malicious acts of companies and the malicious acts of their employees is not made in the District of Columbia. *See Lyon v. Carey,* 533 F.2d 649 (D.C.Cir. 1976) (employer liable where employee raped customer); *Howard Univ. v. Best,* 484 A.2d 958, 987 (D.C.1984) (employer may be liable for employee's intentional infliction of emotional distress on another). Mindful of the principles upon which indemnification cases in the District of Columbia are based, the Court concludes that this is not a jurisdiction that distinguishes between the malicious acts of a company and the malicious acts of a company's employees who are acting within the scope of their duties. Thus, the conclusion of the Maryland District Court that Conrail's employees may have shown a wanton and reckless disregard for human life while acting within the scope of their employment illustrates the need for this Court to rule on the enforceability of the indemnification provision.

tionally, Congress enacted the Federal Railroad Safety Act of 1970, which states as its purpose: "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials." 45 U.S.C. § 421. Indeed, Congress created the Federal Railroad Administration to "carry out all railroad safety laws of the United States," making the Secretary of Transportation responsible "for ensuring that the laws are uniformly administered and enforced." 49 U.S.C.App. § 103(a). Statutes throughout the United States Code reflect the importance of the policy that rail transportation be safe. *See, e.g.,* 49 U.S.C. § 10504(c)(1) (making safety provisions that are applicable to entities regulated by the ICC also applicable to local entities); 45 U.S.C. § 38 (setting forth a reporting requirement for railroads to satisfy after accidents resulting in any personal injury or equipment damage); 45 U.S.C. § 436 (enumerating penalties for failure to comply with a federal "railroad safety rule, regulation, order or standard"); 45 U.S.C. § 646 (requiring the creation of a railroad safety system program); 45 U.S.C. § 851(a)(5) (authorizing Amtrak's installation of "safety facilities or equipment").

The Court is unable to find, when the Freight Operating Agreement is considered as a whole, that the parties clearly, unequivocally and expressly intended the indemnification provisions at issue in this case to extend to and cover the indemnitee's reckless, wanton or willful misconduct or conduct warranting the imposition of punitive damages. *See United States v. Seckinger,* 397 U.S. 203, 211, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970); *Princemont Construction Corp. v. Baltimore and Ohio Railroad Co.,* 131 A.2d 877, 878 (D.C. 1957); *District of Columbia v. Royal,* 465 A.2d 367, 369 (D.C.1983). Moreover, in light of the very strong public policy considerations, the Court cannot conclude that the indemnification provisions at issue in this case are enforceable in cases of gross negligence, reckless, wanton or willful misconduct, or conduct for which punitive damages may be sought. This would deprive the traveling public of its reasonable expectation that the indemnitee Conrail would conform its conduct to the safety requirements of the contract section 2.2(d). Enforcement of the indemnification provisions as sought by Conrail would render meaningless the obligation of Conrail to conform its conduct to the safety provisions, section 2.2.

## IV. CONCLUSION

The Court finds that the parties did not clearly manifest a mutual intent at the time they executed the Freight Operating Agreement, which is the subject of this lawsuit, or any previous agreements between the parties, for the indemnification provisions therein to apply to accidents caused by gross negligence, recklessness, wanton and willful misconduct or misconduct warranting the imposition of punitive damages. Furthermore, public policy will not allow enforcement of indemnification provisions that appear to cover such extreme misconduct because serious and significant disincentives to railroad safety would ensue. Conrail has long been on notice of Amtrak's concern for the railroad safety programs, particularly as they relate to indemnification. In declaring that the indemnification provisions do not extend to aggravated misconduct or punitive damages, the Court is mindful that existing operating agreements between Amtrak and the railroads will not be undermined or negatively affected in the vast majority of cases, where no serious willful or wanton misconduct, such as the deliberate disabling of safety devices, is alleged. In accordance with the foregoing, the Court concludes that the indemnification provisions cannot be enforced where there are allegations and a showing of gross negligence, recklessness, willful and wanton misconduct, intentional misconduct or conduct so serious as to warrant the imposition of punitive damages.

### DECLARATORY JUDGMENT

The Court declares that if section 5.6 of the Second amended and restated North-

east corridor freight operating agreement, dated October 1, 1986, between National Railroad Passenger Corporation (Amtrak) and Consolidated Rail Corporation (Conrail) is interpreted as requiring Amtrak to indemnify Conrail for damages resulting from the injury or death of Amtrak passengers caused by Conrail's or Conrail's employees gross negligence or wilful or wanton misconduct that justifies the imposition of punitive damages, it is unenforceable because of public policy. Otherwise the indemnification provisions of section 5.6 are enforceable.

ATTACHMENT

In the Circuit Court for Baltimore County, Maryland

State of Maryland

v.

Ricky Lynn Gates

Filed October 3, 1988

CA 87–0277–OG

Case No. 87–CR–2420
REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
BEFORE:

THE HONORABLE JOSEPH F. MURPHY, JR., Associate Judge

PROCEEDINGS

THE COURT: Please be seated, ladies and gentlemen. Mrs. O'Connor.

MRS. O'CONNOR: Your Honor, the State would call Indictment 87–CR–2420 for the purposes of entering a plea. I would now like to read into the record the plea agreement.

THE COURT: Very well. Mrs. Schearer.

MRS. SCHEARER: For the record, your Honor, Donna Schearer, Assistant Public Defender on behalf Mr. Gates, along with Carl Schlaich and Deidre A. Bosley.

MR. SCHLAICH: Morning, your Honor.

MS. BOSLEY: Morning, your Honor.

THE COURT: Morning.

MRS. SCHEARER: Your Honor, we have reviewed the memorandum and plea agreement.

THE COURT: All right. Go ahead, Mrs. O'Connor.

MRS. O'CONNOR: It is hereby agreed by and between the State of Maryland by Sandra A. O'Connor, State's Attorney, Sue A. Schenning, Howard B. Merker, Deputy State's Attorney, and John P. Cox, Assistant State's Attorney for Baltimore County, and the Defendant, Ricky Lynn Gates, through his counsel, Donna P. Schearer, Carl R. Schlaich and Deidre A. Bosley, that the following is a complete agreement in this case.

The State will move to amend Count 1 of 87–CR–2420 to include the names of all 16 victims in this case. The Defendant will enter a guilty plea to Count 1 of 87–CR–2420, charging him with manslaughter by locomotive under Article 27, Section 388, a crime punishable by a maximum penalty of five years incarceration and/or a $1,000 fine. The State will submit the case to the Court on the attached Statement of Facts, including referenced exhibits, all of which have been reviewed by the Defendant and his counsel and is agreed to be the complete Statement of Facts in this case. The Defendant has no additions, deletions, or modifications thereto, other than those matters reserved for mitigation at sentencing.

The Defendant expressly agrees to the amendment of Count 1 and waives any objection to the charging document.

The Defendant expressly agrees to withdraw all open motions in this case.

Upon the Court's acceptance of the Defendant's plea of guilt, the State will enter a nol pros to Counts 2 through 16 of the indictment.

The Defendant agrees that at the time of disposition, the State will argue for a sentence of five years incarceration in the Division of Correction. Under the terms of this agreement, the Defendant is free to argue for less. The State will not object to the Defendant's request for a Pre-Sen-

tence Investigation, nor will the State object to the Defendant's remaining free on bail pending the sentencing.

It is further understood that both the State and the Defendant will be able to present to the Court evidence relative to punishment at the time of sentencing, including, but not limited to, victim-impact evidence, evidence of Defendant's background and character, and evidence of railroad industry practices.

THE COURT: All right. I guess the first order of business, then, will be to amend the charging document.

MRS. O'CONNOR: The Motion to Amend. Now comes the State of Maryland by Sandra A. O'Connor, State's Attorney, Sue A. Schenning, Howard B. Merker, Deputy State's Attorney, and John P. Cox, Assistant State's Attorney for Baltimore County, and moves to amend Count 1 of 87-CR-2420 to the following:

That Ricky Lynn Gates late of Baltimore County aforesaid, on the 4th day of January in the year of our Lord 1987 at Baltimore County aforesaid unlawfully, in a grossly negligent manner, did kill and slay Esther Burkhart, Louise F. Edler, Christina Piasecka, Christiane Brooks Johnson, Peggy Joan Moore, Adam Craig Moore, Laura Lynn Debaredino Corti, Ceres Millicent Horn, Kirsten Luce, Corinne Luce, Uriel Phillips Bauer, Caroline Bauer, Thomas Carl Colley, James M. Clay, Gerome Evans and Connie Barry contrary to the form of the Act of Assembly in such case made and provided, against peace, government and dignity of the State.

The Defendant expressly agrees to this amendment. This is the agreed statement of—the plea agreement is signed by the Defendant and all counsel present, and we would introduce these into the record at this point.

THE COURT: All right. Mr. Crawford, please file those documents. There is, of course, no objection by the Defense to this procedure?

MRS. SCHEARER: There is no objection, your Honor. We've reviewed this with Mr. Gates, and he does agree to both

—the Amendment has been signed, both that and the Memorandum Plea Agreement.

THE COURT: All right.

MRS. O'CONNOR: Your Honor, we have also prepared a list of the names to be added to the first count of the indictment so that the Clerk may do so.

THE COURT: Very well.

MRS. O'CONNOR: At this time, your Honor, we would ask that the Defense counsel withdraw all open motions.

MRS. SCHEARER: We are in agreement that we—that is, with the Memorandum of Plea Agreement. We are prepared at this point to withdraw all of our open motions.

MRS. O'CONNOR: The first motion is a Motion for an Independent Investigation.

MRS. SCHEARER: And Production of Documents of interested parties. We'll withdraw that at this point, your Honor. We'll withdraw Defendant's Amended Motion for Production of Persons in Chain of Custody; we'll withdraw our exceptions to the State's Bill of Particulars; we'll withdraw our Motion for Appropriate Relief Regarding the Jury View of the Gunpowder Interlocking; we'll withdraw our Motion to Compel Discovery Identification of State CHC Experts and Chain of Custody; we'll withdraw our Motion to Compel Discovery, Exculpatory or Mitigating Evidence; we'll withdraw our Supplemental Motion for Discovery, as well as our Motion to Compel Discovery Regarding Statements of Edward Cromwell.

THE COURT: All right. All open motions are withdrawn. Is he ready to enter his plea?

MRS. SCHEARER: Pardon me, your Honor? Yes, he is.

THE COURT: All right. Mr. Gates, stand up, please. You understand that you have a right to persist in your plea of not guilty; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. How old are you?

THE DEFENDANT: Thirty-three.

THE COURT: How far have you gone in school?

THE DEFENDANT: Graduated high school.

THE COURT: Are you currently under the influence of alcohol, or any kind of a drug?

THE DEFENDANT: No, sir.

THE COURT: Are you currently under the care of a psychiatrist?

THE DEFENDANT: Yes, your Honor.

THE COURT: Who's the psychiatrist?

THE DEFENDANT: Larry Donner.

MRS. SCHEARER: Your Honor—

THE COURT: Dr. Donner is a psychologist—

MRS. SCHEARER: That's correct, your Honor.

THE COURT: —as I understand it. Are you under the care of a psychiatrist?

THE DEFENDANT: No.

THE COURT: All right. Now, do you understand what you're doing here this morning?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that you're going to plead guilty to a single count, an amended charging document that permits this Court to impose a sentence of up to five years in the custody of the Division of Correction and impose a fine of $1,000? Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, as I understand the plea that's been presented to me at sentencing, the State reserves the right to ask for the maximum sentence. The Defense will ask for a less severe disposition, but I have the right to impose the maximum sentence. Do you understand that?

THE DEFENDANT: Yes, your Honor, I do.

THE COURT: All right. I don't want you to enter a guilty plea this morning unless you're prepared at sentencing to receive the maximum sentence. I'm not guaranteeing that that's what it's going to be, but the State is reserving its right to ask for that, and you should not plead guilty unless you're prepared to receive it. Do you understand that?

THE DEFENDANT: Yes, your Honor, I do.

THE COURT: All right. Now, you have already entered a plea of not guilty and you've asked for a jury trial. Do you understand that by switching your plea to guilty this morning, you're waiving your right to a jury trial?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that if you kept your plea of not guilty on the record, the jurors, if you insisted on a jury trial, would be selected from the voter rolls of Baltimore County; these jurors would be brought here on a random selection basis; you would have an opportunity to participate in the selection process that would place the final twelve jurors in the jury box; you and your attorneys could participate in this process in such a way that no one who was biased or prejudiced against you would be seated as a juror. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, do you understand that by giving up your right to a jury trial, you're really also giving up your right to a court trial because, by pleading guilty, you're confessing to the crime here in court?

THE DEFENDANT: (Nodding affirmatively.)

THE COURT: And you're saying, in essence, there's nothing to try; I'm ready to be sentenced in the case?

THE DEFENDANT: Your Honor, I understand.

THE COURT: You understand that if the plea of not guilty remained in the case, you could not be convicted unless the trier of fact, whether it was a Court or jury, was persuaded of your guilt beyond a reasonable doubt. Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: In other words, if you switched your election to a court trial, me or some other Judge on this court would

hear the case. The Judge would not convict you unless the Judge were persuaded of your guilt beyond a reasonable doubt. Do you understand that?

THE DEFENDANT: Yeah. I do.

THE COURT: At the same time, if you continued to ask for a jury trial, after the jury selection process was completed, as I just described it, the jurors could not convict you unless each and every one of the jurors were in unanimous agreement that you were guilty beyond a reasonable doubt. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: In other words, it's the same standard of persuasion, but in a jury trial they're essentially twelve judges. And even if eleven jurors said, we are persuaded of his guilt beyond a reasonable doubt, if that twelfth juror said, I am not persuaded of his guilt beyond a reasonable doubt, you couldn't be convicted in a jury trial. Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: All right. Do you understand, though, that you're giving up your right to both a court and a jury trial because we're going right to the sentencing phase of the case; if I accept your guilty plea and if I'm persuaded that there's an adequate factual basis for it? Do you understand that?

THE DEFENDANT: I understand it.

THE COURT: All right. Now, a Defendant who pleads not guilty, whether he selects a court trial or a jury trial, has the right to insist upon the presentation of evidence against him in open court. In other words, whether you took a court trial or a jury trial, if there were a trial, no evidence would be presented, except evidence that was received in accordance with all of the rules of evidence, evidence that was received in accordance with your constitutional rights. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: What this means is that any witness who had any information to deliver would have to come into open court and testify under oath and under penalty of perjury. You'd have a chance to watch the witness testify; your attorneys could ask any fair question to that witness. Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: But do you understand that by entering your guilty plea, you're giving up your constitutional right to confront those witnesses and through counsel have cross-examination of it? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: All right. Now, do you understand that if you had persisted in your plea of not guilty, you would have an opportunity to present any evidence that you wish to present, evidence that might show that you were innocent of these charges, evidence that might show that the State's case was not strong enough to convict you because the State's case wasn't strong enough to find, permit the finding that you were guilty beyond a reasonable doubt? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: However, by entering the guilty plea, you waive your right to produce evidence. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Had you entered, or had you consistently maintained your plea of not guilty, had you not withdrawn it, you would have a right during the trial to make a choice. The choice would be whether you wanted to testify or remain silent. In other words, because you're the criminal Defendant, the State couldn't call you to the stand and demand you answer any questions.

THE DEFENDANT: (Nodding affirmatively.)

THE COURT: The State couldn't comment on your silence if you decided you did not wish to testify.

THE DEFENDANT: (Nodding affirmatively.)

THE COURT: At the same time, however, you would have a right to testify. And if you did testify, you'd be treated like

any other witness. The point is, though, that that choice that's available for someone who enters a plea of not guilty is gone. Now that you've entered the plea of guilty, or once your plea is completed, you waive your right to make that choice. Once again, you're giving up your right to testify. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: All right. Now, someone who enters a plea of not guilty and who gets convicted has an automatic right to have the Court of Special Appeals hear its case. The Court of Special Appeals is the appellate court to which a conviction in this case would go for purposes of review. In the Court of Special Appeals, the judges would reverse the case, or perhaps reverse and remand it for a new trial if they were persuaded that the Defendant did not get a fair trial. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: At the same time, however, someone who enters a guilty plea forgets the automatic rights to appellate review. You have the right to ask the Court of Special Appeals to hear the case. But it's most unlikely that the Court of Special Appeals would hear it. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And, as I recall, Mrs. O'Connor made reference to the plea agreement to the fact that the Defendant was waiving even his right to request that the Court of Special Appeals consider an appeal in this case. Is that correct?

MRS. SCHEARER: That's not noted in the Memorandum of Plea Agreement, your Honor.

THE COURT: Oh, well, in any event, you do then have the right to ask the Court of Special Appeals to hear the case. But because you're pleading guilty, it's most unlikely that that Court would hear it; do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: Now, even if the Court of Special Appeals decided to consider your case, it seems unlikely that they would inquire into any of the potential areas for appellate review, except four very narrow areas.

THE DEFENDANT: (Nodding affirmatively.)

THE COURT: One is the voluntariness of your plea, and that's why I'm asking you these questions—

THE DEFENDANT: (Nodding affirmatively.)

THE COURT: —to make sure your plea is free and voluntary. Do you understand that?

THE DEFENDANT: Yes, I do, your Honor.

THE COURT: The second is the jurisdiction of the Court. Now, this tragedy occurred in Baltimore County so this Court has jurisdiction.

THE DEFENDANT: (Nodding affirmatively.)

THE COURT: Do you understand that?

THE DEFENDANT: Right.

THE COURT: The other aspect would be the legality of the sentence. Obviously, if I impose a sentence above five years, or above a thousand dollars, then that's an illegal sentence. But if I impose the maximum, or something less, that's not an illegal sentence. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Finally is the competency of your counsel. Now, I know your attorneys and I know they're fine lawyers. But I wanted the record to show that you are satisfied with their services, if, indeed, you are. Are you satisfied with the services of your counsel?

THE DEFENDANT: Yes, your Honor, I am.

THE COURT: Have your attorneys done everything you wanted them to do to be ready to represent you in this case?

THE DEFENDANT: Yes.

THE COURT: Have your attorneys failed or refused to do anything that you wanted them to do to get ready to try this case?

THE DEFENDANT: No, they haven't.

THE COURT: All right. Have your attorneys done anything that you did not want them to do to get ready to try this case?

THE DEFENDANT: No, sir.

THE COURT: Well, then, obviously you're fully satisfied with the services of your counsel, and on the basis of your answer to these questions it seems virtually certain that you won't have any appellate review of any kind and the case will be finished when I'm done sentencing you. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Now, you've already withdrawn all of the pre-trial motions that were filed in this case. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you understand that by entering a guilty plea, you're also waiving your right to any kind of a technical defense that you might have? If there's some misspelling in the charging document, if there's some little technicality that might otherwise require the dismissal of that, by entering a guilty plea, you're waiving your right to complain about it.

THE DEFENDANT: I understand.

THE COURT: All right. Now, are you pleading guilty in this case because you, in fact, are guilty of the charge that has been called for trial this morning?

THE DEFENDANT: I believe I am, your Honor.

THE COURT: Except for the plea agreement that I've heard about here, have there been any other promises made to you, or any other threats made against you, or any other inducements offered to you to get you to enter a guilty plea?

THE DEFENDANT: No, your Honor.

THE COURT: All right. Now, as I understand it, you are on probation.

THE DEFENDANT: Yes, sir.

THE COURT: But the probation that you're on would not be violated by virtue of your guilty plea in this case; is that correct?

MRS. SCHEARER: That is correct, your Honor. He was not on probation at the time of the crime.

THE COURT: And he's not on parole or probation for any other offense?

MRS. SCHEARER: Nothing, your Honor.

THE COURT: Is that true?

THE DEFENDANT: (Nodding negatively.)

THE COURT: All right. Any additional questions of the Defendant from the State?

MR. MERKER: None from the State, your Honor.

MRS. O'CONNOR: No, your Honor.

MRS. SCHEARER: None from the Defense, your Honor.

THE COURT: All right. I'm satisfied his plea is freely and voluntarily presented. Let's hear the factual basis.

MRS. SCHEARER: Thank you, your Honor.

MR. COX: Your Honor, for the record, I'm John Cox, Assistant State's Attorney. At this time, I would move into evidence the signed copy of the Statement of Facts, and with reference to—and move into evidence all of the exhibits which I will be referring to when I read the Statement of Facts. Those will be Exhibits 3 through 18. The Statement of Facts, itself, would be marked as State's Exhibit 2.

THE COURT: All right. Mr. Crawford, do you have the exhibits marked?

MR. CRAWFORD: Yes, Judge.

THE COURT: All right.

MR. COX: Your Honor, the Statement of Facts in support of the plea. It is agreed by and between the State of Maryland by Sandra A. O'Connor, State's Attorney, Sue A. Schenning, Howard B. Merker, Deputy State's Attorneys, and John P. Cox, Assistant State's Attorney for Baltimore County, and Ricky Lynn Gates, the Defendant, by Donna P. Schearer, Carl R. Schlaich, and Deidre A. Bosley, Counsel for the Defendant, that the following Statement of Facts is true, accurate and complete.

The Defendant's Employment. On January 4, 1987, the Defendant was employed by the Consolidated Rail Corporation, which is referred to as Conrail. He had been so employed since March of 1976. After successfully completing a five-month course in March of 1976, the Defendant was promoted to the status of engineer. He maintained this job classification up to and including the date of the collision. At the time of the accident, the Defendant was the engineer of the Conrail consist led by engine 5044.

The duties of an engineer, as outlined by the operation rules governing the railroad, are that an engineer is responsible for the actual and safe operation of a train, including the performance of all equipment tests, such as brakes, cab signals, whistle and radio, the observance of and compliance with all signals governing the engine's movements, the safe regulation of the speed of the engines and the vigilance and conduct of other employees on the engine.

The operational rules further provide that engineers must be periodically trained and tested on the Amtrak Operating Rules. The Defendant received this training and passed the test with a score of 100 on July 24, 1986. The rules further provide that engineers must receive air brake instruction testing. The Defendant passed his test on July 22, 1986. On the same date he passed a test on the Conrail rules, safety and timetables.

The Defendant had also been road tested on June 23, 1986. At that time, a foreman for Conrail rode in the cab with the Defendant to observe that he complied with the rules while operating along the corridor that includes the Chase and Gunpowder areas.

During the past three years, the Defendant had operated a train northbound through Gunpow interlocking 201 times.

On January 4th, the Defendant and the brakeman, Edward Cromwell, were both on an extras list. This is a list of engineers and trainmen that do not have regularly scheduled assignments. Employees on an extras list must make themselves available for call on a seniority basis after a minimum rest period required by contract. When called for duty, the engineers and trainmen have a time limit in which they must report for duty. For the Defendant and Cromwell the time was two hours.

The Track Between Baltimore and Gunpowder. The railroad tracks in place between Baltimore's Penn Station and the Gunpowder River at the Baltimore County and Harford County line are owned and controlled by the National Railroad Passenger Corporation, which is better known as Amtrak. The section is considered to be within the Philadelphia Division of the Northeast Corridor of Amtrak.

The Consolidated Rail Corporation, also known as Conrail, is permitted by contractual agreement to operate their freight trains on the Amtrak Northeast Corridor. The trains and personnel of Conrail are subject to Amtrak rules and regulations while on Amtrak lines.

Your Honor, at this time, what we have marked as State's Exhibit 10 I will be referring to showing the track chart areas as I go through the statement in this particular area. Your Honor, first, Penn Station is located near Milepost 96 of the track. For the record, the milepost numbers are derived in and they're coming down from Pennsylvania, or from Philadelphia. Effectively, this is the 96 milepost from where the train tracks originate in Philadelphia. The Bayview Yard, which is a freight yard located in this area to which I'm referring, is located between Mileposts 92 and 89. The Gunpowder River is located at the end of this chart at Milepost 79. After the Union Tunnel, which is located just past Penn Station, there are four tracks over the entire 17–mile span up to the bridge at the Gunpowder River.

The tracks are designated as Track A, Track 1, Track 2 and Track 3. Track 3 is a high speed track and is primarily used for southbound passengers. Track 2 is also a high speed track and is primarily used for northbound passenger trains. The directions which were shown—this would be northbound heading in this direction and southbound towards the Penn Station. The maximum allowable speed on Tracks 2 and

3 is 125 miles per hour for passenger trains and 50 miles per hour for freight trains. The maximum allowable speed on Track 1, located here, is 110 miles per hour for passenger trains and 50 miles per hour for freight trains. Light engines, which are engines not pulling freight, have the maximum speed of 60 miles per hour. The maximum allowable speed for Track A is 80 miles per hour for passenger trains and 50 miles per hour for freight trains.

The four tracks narrow to two tracks at an area which is referred to as the Gunpow interlocking just prior to the bridge at the Gunpowder River and is located in Baltimore County. The tracks in this area were inspected two days prior to January 4, 1987. There were no defects noted. Each track was in compliance with the minimum Federal Railroad Administration's track safety standards for its class. Train movement in the area is controlled by a train dispatcher, who is located in Philadelphia. It is the responsibility of the dispatcher to monitor all train movements in his area and to communicate to the tower operators how trains are to be routed through the interlockings and the order of the movement of trains. The communications between the dispatcher and the tower operators are by train wire telephone lines. The operator then adjusts the switches and signals in compliance with the routing directions of the dispatcher.

The switches and signals prior to Gunpow are operated by remote control by the operator at Edgewood Tower, which is located at Milepost 75.3, which would be further north from the Gunpowder River. Your Honor, photograph of the Edgewood Tower, two photographs. First, as State's Exhibit 3, which shows the entire number of boards that the tower operator would be responsible for maintaining, and State's Exhibit 4, which shows the particular board which controls the Gunpow interlocking I would offer for the Court at this time.

THE COURT: Received.

MR. COX: To control the switches and signals, the operator pushes a button on the control board at the Edgewood Tower, which is transmitted electronically to Gunpow. Safety circuits are checked electronically to assure the change would not conflict with movements on the other tracks. If there are no conflicts, the request is fulfilled. The system is designed to prevent the tower operator from routing two conflicting movements. The wayside signal, a photograph of one of those wayside signals, which is State's Exhibit 5, which I would offer at this time. The wayside signal, after request, is then displayed and this fact is transmitted back to the tower. A light on the tower operator's control board indicates the signal is displayed and a light over the switch request indicates the switch is locked. The operator's board also indicates the presence of a train in certain locations on the track.

Your Honor, the Signal System. Train movement in the area is regulated by wayside signals mounted in specified areas along the tracks and cab signals which are inside the locomotives traveling on the tracks.

The wayside signals, which are similar to the photo already offered as Exhibit 5, consist of sets of electric lights which are positioned directly over or to the right of and adjacent to the tracks that they control. The aspect or light combination displayed on those signals directs trains to proceed, reduce speed or stop.

The aspects displayed on wayside signals are controlled by energy transmissions through the rails of the tracks. The signals are displayed according to the level of energy being transmitted. A higher level is required for a more favorable signal. If the energy transmission is cut off, the most restrictive signal would be displayed.

The wayside signal just before an interlocking is referred to as the Home signal. Your Honor, Exhibit 6, which is this chart here, exhibits the signals as they are for the Gunpow interlocking. They're a more concise version of what's shown on Exhibit 10. The Home signal and the signal prior to a Home signal is referred to as the Distant signal. At the Gunpow interlocking, the Home signal is located at Milepost 79.7 and the Distant signal, which in this chart is listed as the Chase signal that is

also referred to and will be referred to as the Distant signal, is located at Milepost 81.6. The Distant signal is 10,318 feet from the Home signal. The signal south of the Distant signal, which would be shown on this chart, is located at Milepost 83.6.

The 83.6 signal is referred to as the Bengies signal. The signal will normally display a clear signal for each track. This means that the trains are clear to proceed to the next signal at normal speeds for the track and the type of train. The only time a clear signal could not be displayed on the Bengies signal is if that particular track is occupied by another train at some distance just before it.

At the Distant signal, the one prior to the Home signal, a Clear signal indicates that the train has the right to proceed at its regulated speed. An Approach signal shown on the wayside indicates that the train must approach the next signal prepared to stop. If the train is exceeding 30 miles per hour, the train must reduce to at least 30 miles per hour upon going under an Approach wayside signal. A Restricting signal indicates that the train must proceed at a restricted speed. A restricted speed means a speed at which the train is prepared to stop short of visible dangers. A restricted speed in an interlocking area, such as the Gunpow interlocking, is no greater than 15 miles per hour. Outside of an interlocking, a restricted speed is no greater than 20 miles per hour.

The Home signal for Track No. 1, which would be located right at this location, can display only one of three signals. If the switch is thrown for Track 1 to merge into Track 2, the switch being right at this location, then the signal display on the Home signal will be displayed as Limited Clear. For freight trains, this means that the train can proceed within the interlocking at limited speed, which is defined by the rules as 45 miles per hour. If the switches are thrown such that the train on Track 1 will merge into Track 2 and then later merge into Track 3, which is further up, which would be off this chart, then the Home signal for Track 1 will display a Medium Clear aspect. This permits movement through the interlocking at medium speed which, for freight trains, is no more than 30 miles per hour. If the switch between Track 1 and Track 2 is aligned for trains on Track 2 to proceed straight through, heading in this direction and then going straight through such that this switch would be against Track 1 merging, then the Home signal for Track 1 will display a Stop Aspect. This signal requires the train on Track 1 to stop short of the Home signal. If the Home signal displays stop, then the Distant signal here must display an Approach signal. This is how the track and signals were set on January 4, 1987.

The area near and at Gunpow interlocking is also regulated by cab signals within the trains. The signals are located within the cab of the locomotives mounted in the middle of the front windshield at the top to the engineer's left within his line of vision. The cab is also equipped with an audible whistle which will activate every time a cab signal changes to a more restrictive signal. This whistle emits a loud and shrill sound each time the whistle drops. The whistle operates a fail-safe device to alert an engineer in the event his attention is diverted. The whistle must be acknowledged by the engineer by depressing a foot pedal which then de-activates the sound.

The lights within the cab signal will display one of four aspects at all times while in cab signal territory. The aspect displayed on the cab signal box is controlled by the energy level transmitted through the rails and picked up by the locomotive at designated locations on the track. Your Honor, can you see this box here?

THE COURT: Yes.

MR. COX: Your Honor, this is a facsimile of a cab signal which is displayed within the Conrail or the train locomotive shown up to the left of where the engineer is located.

The signal box can display one of four signals. Those signals are Clear, which is displayed at the top here, or Proceed. The second signal is Approach Medium. And you'll note that actually Approach Medium lights two different circles. The two to-

gether are the signal Approach Medium. The third signal is Approach, shown as I've shown here, and the fourth signal is Restricting, shown on the bottom.

At Gunpow interlocking, the cab signals are affected at a cut section identified as a Code Change Point, which is located at Milepost 82.6. This is located—there is not a wayside signal here; this is a Code Change Point within the rails located right here. The cab signals are also affected at the Distant signal, which is located at Milepost 81.6, again affected at another cut section, or Code Change Point located right here at Milepost 80.6. For Track 1, the cab signal prior to the Distant signal, will always be Proceed. If the Distant signal for Track 1 shows Approach Limited or Approach Medium, then the cab signal will drop to Approach Medium within the cab. If the Distant signal is Approach, the then cab signal will drop to Approach, which was the third signal that I displayed.

Your Honor, this chart, also, which is Exhibit 8, shows an interpretation basically of those signals and then what they mean in terms of which one is displayed. If the Distant signal, as stated, is Approach, then the cab signal will drop to approach. This is an indication that the engineer must reduce to at least 30 miles per hour and be prepared to stop at the next signal. If the Home signal for Track 1 displays a Stop, then the cab signal at the 80.6, which is the signal just prior to the Home signal, will drop to a restricting on the cab signal, itself, which indicates that the engineer must, at once, reduce to restricting speed, and the train must stop at the Home signal.

Amtrak Rule No. 34 requires that each crew member in the operating compartment of a locomotive observe and call out each signal seen on cab signals or wayside signals to the other crew members. When there is a conflict between the outside wayside signal displayed and a cab signal, then the most restrictive signal must be followed under Rule No. 551. Additionally, Rule 554 states that when the whistle is not audible, or if a light is not working, the train is considered in failure and movement of the train is prohibited.

Conrail trains are required to have an operating cab signal system while on Amtrak tracks and the cab signal apparatus must be tested before a train leaves its initial terminal.

The Event Recorded. At the Gunpow interlocking, the interlocking is equipped with a microprocessor recorder, which is referred to as an event recorder. The event recorder is a microcomputer with 64 input connections which are voltage sensitive. The recorder scans the 64 different possible inputs approximately 1,000 times every second. If there is a change in any of the 64 inputs, then all 64 are recorded with the time noted to the tenth of a second according to an internal clock within the event recorder. The event recorder performs its own internal test every hour. The recorder at the Gunpow interlocking is located to the side of the tracks, at Milepost 79.5. It was not damaged in the collision and is secured with signal locks.

The recorder at the Gunpow interlocking was equipped to record each signal and switch change request, each signal and switch change for every track and the presence of a train on portions of each track.

The Conrail Consist. The three Conrail locomotives involved in the collision were all GE Model No. B36–7. The numerical designations were Engines 5044, 5052, and 5045. Each is approximately 62 feet long and each has a fully fueled weight of 271,-580 pounds. The 5044 was the lead unit on January 4, 1987. This particular locomotive was last used as a lead engine in cab signal territory on December 16, 1986. The last noted cab signal test was on December 15, 1986, with no noted defects. The engine was in proper working order, except for matters which are mentioned later in this Statement of Facts. Its last maintenance was repair for an air compressor on December 8th, 1986.

Unlike the Amtrak Colonial, the Conrail engines were not equipped with automatic train control. This is a safety system that mechanically stops a train if the engineers fail to respond to signals and reduce speed. The Colonial was too close to the interlocking when the consist broke the switch and

traveled onto Track No. 2 for the Colonial to have stopped by manual or mechanical operation.

The Pulse Recorder. Each Conrail locomotive was equipped with a Model 48HAC–6 multi-event recorder, which is manufactured by Pulse Electronics and commonly referred to as a pulse recorder. The recorder records onto a data pack, which is a computer quality 8–track audio cartridge. Four channels are recording at all times there is power applied to the locomotive. The first channel is a clock frequency recorder based upon an internal clock. The second channel records speed of the locomotive. This is determined by wheel revolution. The third channel measures the power being generated in amperes by the locomotive. The fourth channel is a digital recorder which records eight bits of information. On the Conrail locomotives, the eight bits are designed to record the throttle position of the locomotive between idle and Throttle 8, the brakes between released and full emergency brake application, the independent break valve and fuel safer operation.

The pulse tape cartridge operates on a 48–hour continuous play recording. It records over the oldest information previously recorded. When the tape is pulled, it will have the last 48 hours of information on it.

Pre–Departure on January 4, 1987. Early Sunday morning, January 4, 1987, Conrail TV 22, consisting of three diesel engines, Nos. 5045, 5052, and 5044 with approximately 40 cars, arrived at the Bayview Yard on a relay run from Chicago. Later the same morning, Enola Yard in Harrisburg, Pennsylvania called Bayview requesting engines. Consequently, these three engines were placed in service for a light engine run, that is, not carrying freight cars from Bayview to Enola. As incoming TV 22, which was a southbound movement, the engines were positioned with the 5045 leading and the 5044 in the rear coming into the yard. This placement was reversed for the northbound run since it was a northbound run. And the way in which

the trains were pointed, the 5044 would then lead out of the yard.

This northbound run covers 110 miles of track in the northeast corridor where freight and passenger trains commonly share track. Round trip to Enola by train and return by taxi is estimated to take approximately three to four hours. On this particular run, the engines' traverse track shared with Amtrak passenger trains until reaching Perryville, which is a freight yard just north of the Susquehanna River, where they switch over to Conrail's freight only tracks heading west to Enola.

At 10:19 a.m., crew dispatcher Lawrence McKittrick contacted the Defendant, as engineer, and Edward Cromwell, as brakeman, from their respective extras list. Standard procedure allowed the men two hours to report for duty. When called for work, neither man knew with whom he was working. The Defendant's compensation for his duties on January 4th was $252.18, based upon union-negotiated wage schedules.

At 12:15 p.m. on January 4, 1987, which was a cold and clear day, the Defendant and Cromwell, reporting for work at Bayview Yard, contacted Yardmaster David Holstein by phone for further description of their work assignment. Holstein described the engines, their location and their route and further instructed the Defendant and Cromwell to prepare for the run by removing its engines from two ladder, which is a side track within the yard where they had been sitting since 1 a.m. that morning. Trainmaster George Mince, who is responsible for the supervision of train crews in the yard and on the road, encountered the Defendant and Cromwell in the yard office before their departure. Mince noted nothing unusual about either man's behavior or physical condition. Mince observed that Cromwell carried a portable yard radio.

The Pulse Recorder on the engine indicates that at 12:42 p.m., the Defendant released the automatic brake valve and prepared the engines for service. They contacted Dave Holstein requesting permission for a reverse move onto the lawn from two

ladder. The lawn is the area where the pre-departure tests are performed, which I'll be referring to shortly. Bay Tower authorized the move. The pulse recorder verifies this movement occurred from 12:51 p.m. to 1:04 p.m. From his vantage point, Holstein noted the engines reverse and stop before reaching the lawn track whereupon the Defendant and Cromwell left the engines to enter the yard office once again to obtain fusees, which are road flares, and paper towels. The crew returned to the engines and continued onto the lawn for pre-departure testing.

The Preliminary Testing. Amtrak rules governed this move since it would traverse Amtrak property from Bayview to Perryville.

Amtrak operating rules require that engineers conduct three areas of preliminary safety testing before entering into service. First, the engine must be properly maintained with all equipment functioning, including the engine's radio. Secondly, the engineer must thoroughly inspect the brake system and conduct certain tests of the air brakes with the engine running. Thirdly, both the visual and audible cab signal systems on the lead and trailing units must function appropriately. In each of these three areas, the Defendant either failed to perform the tests as required, or failed to correct obvious defects that he knew or should have known existed on the engines. The pulse recorder indicates that the Defendant spent four minutes on the lawn track from 1:04 p.m. to 1:08 p.m. in performing some of the preliminary tests.

The Brake Testing. Performance of preliminary air brake tests are recorded on the pulse recorder of each engine when there is an application of brake cylinder pressure and a release of brake valves. Al Ray, who is a Conrail superintendent of Locomotive Power East, in reviewing the pulse recorder retrieved from the 5044 concluded that the Defendant failed to conduct the proper air brake pre-departure test. Notwithstanding the failure to test, the National Transportation Safety Board found the brakes functioning as designed when they were subsequently tested.

Equipment. When the Defendant entered the 5044 engine, he found that the engine lacked a working engine radio. Since there was no maintenance crew working on January 4, the Defendant removed the radio belonging to the rear engine and attempted to connect it to the lead engine. In his NTSB testimony on January 7, 1987, the Defendant indicated that the wire connectors were bad and this radio was not functioning. He further stated that he obtained permission to use the yard portable, which is a hand-held radio designed for use in a freight yard. Both Yardmaster David Holstein and Trainmaster George Mince denied giving the Defendant clearance to use the yard radio. Although Trainmaster Mince was aware of the problem, he concluded from conversation with the Defendant that the Defendant would correct the problem by connecting a radio from the middle units before departure. By their admissions, the Defendant and Cromwell never corrected the situation and relied on the yard radio for communication. It should be noted that although the Defendant concluded that bad wire connectors prevented the engine's radio from working, NTSB investigators found it to be functioning properly on January 11, 1987 when tested.

The Defendant further complained in his statement to the NTSB Hearing Board that the windshield of the lead unit was soiled, obstructing his vision. Conrail procedures require reporting of such conditions. Although the Defendant maintained that he told this to Mr. Mince and got paper towels before leaving, Mr. Mince denies that he made such a report. In inspection of the engine after the collision, NTSB investigators did not take exception to the condition of the windshield.

The Cab Signals. The location for conducting tests of the cab signal systems is the test rack on the lawn within the yard. In conducting tests, rules require that each aspect light when appropriate. In the event that a bulb is missing or burned out, replacement bulbs are available and easily installed. Operating rules require tests of both the lead and trailing engine in the

event a reverse move is required. Pulse records indicate that the trailing unit was never tested. In subsequent questioning before the NTSB, the Defendant and Cromwell said they had tested both the lead and trailing units.

The cab signals and the warning whistle were tested with the Defendant seated inside the lead engine and Cromwell outside operating the four-position switch that triggers the appropriate drop in signals. While Cromwell was outside at the circuit box, the Defendant rang a bell to acknowledge each position change. From his position outside on the ground, Cromwell was not able to see the signal or to hear the whistle reaction in the cab. Cromwell concluded from the Defendant's response that all signals were properly working. Yardmaster David Holstein confirmed that Cromwell appeared to be conducting cab signal tests outside the unit.

Following the collision, NTSB investigators at the accident site entered the lead engine at approximately 10 o'clock p.m. At that time, they noted that a bulb was missing from the Approach aspect of the cab signal, which would be this signal right here. The next day, NTSB investigators replaced the missing bulb and found that the light functioned properly. In questioning before the NTSB on January 7, 1987, the Defendant maintained that all four aspects lit when tested.

On Monday, January 5, 1987 at 4 o'clock p.m., the NTSB Vehicle Factors Group conducted extensive testing of the lead unit, including the functioning of the cab signals and the warning whistle. The group included Conrail Superintendent Al Ray. Mr. Ray noted that upon dropping the signals, the whistle emitted no sound. After removing the panel cover and exposing the whistle, the investigators found that the whistle had been completely sealed with duct tape. The only audible sound was a faint hiss. The Federal Bureau of Investigation examined the tape for latent prints and found none. Further, they estimated that the tape had been on for some time but could not determine its age. Upon cutting open the tape with a pen knife, the

whistle sounded loud and clear. Your Honor, shown on State's Exhibit 9 is an enlarged photograph of the whistle, itself, shown position upwards at this point. The duct tape shown just so that you'll note for the record this is the area where it was cut to see if it was working properly. It was in clean condition when it was originally found. In questioning before the NTSB, the Defendant maintained that during testing he did hear a whistle, albeit a faint one, when the signal dropped.

In summary, five failures occurred during preliminary testing. First, the failure to correct the taped whistle, the missing bulb, the use of a yard portable when a properly functioning engine radio was available, failure to perform signals tests on the rear unit and failure to test the brake system.

The Defendant did not report the apparent failures to Supervisory Personnel Mince or Holstein prior to departure as required. Had he reported them, he would have to undertake corrective measures which necessarily include a delay in his departure time.

Track Alignment For The Consist. Earlier in the morning of January 4, Train Dispatcher John Akins coordinated with Bay Tower Operator Milton Brown and Edgewood Tower Operator Rich Hafer all train movements through Bayview north to the Gunpow interlocking and beyond. Per Akins' instructions, Hafer aligned the tracks at Gunpow so that northbound passenger trains on Track 2 would have the right-of-way—this would be on this track heading straight through the Gunpow interlocking—thus holding up northbound freight trains at the interlocking until passenger traffic was cleared. Since 10:30 a.m., the tracks and switches at the interlocking were set in this, the normal alignment. Akins instructed Hafer to allow the Amtrak 94 Colonial and the 112 Metroliner, traveling five minutes behind the 94, through the interlocking before the Conrail consist. This alignment meant that the Defendant's consist would be held with a Stop at the Home signal, the last wayside signal before entering the interlocking.

He could only proceed after the Colonial and the Metroliner were safely through.

With the switch set at Stop at the interlocking, the resultant wayside and cab signals for the Defendant's consist on Track 1 was clear on cab and wayside from Bayview Yard all the way up until the Distant signal. Again, also labeled here as the Chase signal. The first signal drop occurred at the Distant signal. This would have registered as an approach both on the wayside signals and the cab signal—this signal here—as well as triggered the warning whistle. The second signal drop occurred at the Code Change Point one mile from the Home signal—located here—where the cab signal would drop to Restricting, the bottom signal and, once again, this would sound the whistle. There is no corresponding wayside at the Code Change Point, the 80.6. At the Home signal, Stop appears on the wayside while Restricting still appears in the cab. The signals set for the Colonial on Track No. 2 were Clear through the Distant signal through the Code Change Point and the Home signals.

Post collision review of the event recorder data retrieved from the interlocking on January 4, 1987 at 5 o'clock p.m. revealed that all circuits and switches were properly functioning. Further, the track, as well as the corresponding signals, were set as indicated by the Tower Operator, Hafer.

The Consist Departure From Bayview. At 1:08 p.m., the Defendant communicated with Bay Tower Operator Milton Brown, indicating he was ready to leave the yard. At 1:13 p.m., the tower cleared the Defendant to proceed to Track No. 1, which is the track commonly used for northbound freight trains.

At 1:15 and 30 seconds, the consist, engineered by the Defendant, came out of the yard and was traveling at 10 miles per hour. Your Honor, the area that he exited from would be this area. Not the large part of the yard, but this area indicated right here. For the record, what you see is these, orange tape, which is displayed above this orange tape. What it signifies is an interpretation of the pulse recorder

from the 5044 showing the speed of the engine. And then that was interpreted and then related to the point on the track. Therefore, as it goes across here, each area would indicate where the Conrail was located at this particular location. This would show the speed. Speeds are obviously determined by the numbers which are shown in three different areas on the chart.

At 1:18, the Defendant had the consist in Throttle 2 and was traveling at 56 miles per hour right up in this area. At 1:20, he was on Track No. 1 and at Milepost 89 and had accelerated to speeds between 60 and 65 miles per hour right in this area. He passed Stemmers Run, which is located right here near Milepost 87 at 1:21 and 30 seconds, maintaining that speed. He passed the Middle River signal, which is located here near or at Milepost 85.8, at 1:23 and 30 seconds and then passed the Bengies signal, located at Milepost 83.6 in this area, at 1:25 and 30 seconds. The signals were Clear and the Defendant was shifting between Throttle No. 1 and Throttle 2 in order to maintain a speed just over 60 miles per hour.

As the Defendant reached the Distant signal, which is located at Milepost 81.6, the wayside signal was showing approach, requiring a reduction in speed to 30 miles per hour. But for the missing light bulb, the cab signal would have also displayed approach. This would also be the first time the warning whistle would sound if it had not been taped. The pulse tape of the 5044 shows that the Defendant did not reduce his speed but continued at 60 miles per hour and at Throttle 1. There was no brake application. The time was 1:27 and 30 seconds.

One minute and one mile later, which is the Code Change Point located here, the Defendant passed the Code Change Point which dropped his cab signal to Restricting, requiring a speed of 15 miles per hour in preparation for a Stop. This bulb was working but the warning whistle was again inaudible. The pulse recorder shows that just as he passed that point, the Defendant did not brake or reduce speed but, in fact, he shifted up to Throttle 2 and slightly

increased his speed about 60 miles per hour. At this point, the consist was one mile from the Home signal displaying a stop. No braking action or reduction in speed occurred for more that, you know, one-half mile until the Defendant's consist was approximately 1,650 feet from the Home signal, which we are—on this chart would be in this area, approximately here. Only then did the Defendant apply the emergency brakes in an attempt to bring the train to a stop.

The emergency braking started at 1:29 and concluded approximately 45 seconds later. The consist had skidded 450 feet past the Home signal. The tape and the interpretation from the pulse recorder showing that rapid reduction in speed right in an area just past the Home signal—450 feet past would be located just in here, in this area where the first two Conrail engines are shown. Because the switch was not aligned for the Conrail consist to proceed onto Track 2, the consist broke the switch. The lead and middle units of the Conrail consist were now on Track 2 and the third unit still in the switch, okay, arrived right in that area.

The collision occurred 14 and one-half seconds later at a point approximately 600 yards from the Gunpowder River. Your Honor, we have an enlarged photograph, which is marked as State's Exhibit 12, which will show you the relation of the Gunpowder River. I don't know if you can see this.

THE COURT: Yes, I can see it fine.

MR. COX: Just for the record, this is the Home signal that we've been referring to, the switch select located right in this area and then, obviously, the Gunpowder River located further up.

THE COURT: Can you illustrate on this exhibit, Mr. Cox, where the front end of the Defendant's locomotive was at the time he began to apply his brakes?

MR. COX: I can make an approximation, your Honor. Based on what it shows, the front engine would have been located in approximately this area. On this area right here—

THE COURT: All right.

MR. COX: —the Code Change Point, this distance between .86 miles.

THE COURT: All right.

MR. COX: The Sight And Stop Distance Tests. On Monday, January 12, 1987, sight and stop distance tests were conducted by the National Transportation Safety Board and the Federal Railroad Administration investigators, as well as representatives of Conrail and Amtrak. Light and weather conditions were similar to those existing on January 4. From those tests, investigators concluded that the Defendant had more than sufficient time and distance to see the Home signal and Stop, using a normal brake application before entering the interlocking.

The Colonial From Bayview to Gunpow. The Amtrak 94 Colonial, which is a consist consisting of two electric engines, Nos. 900 and 903, and twelve passenger cars left Washington, D.C., its point of origination, at 12:35 p.m. On departure at 1:16 p.m. from downtown Baltimore, the Colonial was crowded with holiday travelers and students returning to schools in the northeast. Fortuitously, at Baltimore, no passengers were allowed entrance on the first car in the consist, which was reserved for additional passengers anticipated in Philadelphia and Wilmington. The second car contained 25 passengers; all other cars were full to capacity, carrying a total of 660 passengers.

At 1:25 p.m., Bay Tower notified Rich Hafer in Edgewood Tower that the Colonial was just passing on approach to the interlocking. Hafer responded correctly by giving the Colonial the planned Clear signal through the Gunpow. This did not require any change in track alignment, nor did it cause any change in signal on Track 1, which was the track bearing the Conrail consist.

As the Colonial reached the Distant signal at Chase, and the subsequent Code Change Point, its recorded speed was between 120 and 125 miles per hour operating under Clear signals. Ordinarily, 120 miles per hour was its maximum authorized

speed. On this particular trip, its speed was restricted to 105 miles per hour because of an older Heritage car in the consist.

As the Colonial reached 2370 feet from the Home signal, which would be located within this area here on Track No. 2, the Clear signal ahead on the wayside at the Home signal dropped to a Stop. The signal change was triggered by the Conrail's consist breaking the switch and entering Track No. 2. Within seconds, the Colonial's engineer, Jerome Evans, applied his emergency brakes in a futile effort to stop his engines before colliding with the Conrail consist. Evans attempted to jump from the cab within seconds of the collision. However, he was unable to escape the explosive force of the impact and died instantaneously.

Records from the Colonial's speed recorder show that only 15 seconds transpired between the time the signal dropped and the collision occurred. Evans applied the emergency brakes for eight seconds, reducing the speed of the Colonial to between 100 and 105 miles per hour prior to impact.

The Amtrak engines are designed to Stop at 10,700 feet with a full-service brake application at 120 miles per hour and at 7480 feet for the emergency brake application. Although the 900 and the 903 were equipped with automatic braking systems, they were not activated because all signals up to the Home signal were clear. Unquestionably, insufficient time and distance existed to allow Engineer Evans to stop the Colonial before sliding with the Conrail consist.

Inside The Conrail Consist. On moving out onto Track 1 out of the yard, Cromwell sat in the fireman's seat while the Defendant sat at the controls. Both faced forward. The Defendant called out the first two to three signals within one and a half miles of the yard as Clear, which would be displayed as these signals on this chart. And, at that time, Cromwell acknowledged the Defendant calling out nine signals. Although Amtrak operating rules require that the engineer call each wayside signal and that the brakeman acknowledge, no more signals further down the track were called in the remaining nine miles. After the third signal, Cromwell pulled out a pin joint, which is a very thin, hand-rolled cigarette, containing marijuana that he had brought in his grip. Although he had originally intended to use it on the ride home, Cromwell decided to smoke it then with the Defendant because the two smoked while working on one previous occasion. Each man had about three hits of the joint. Then Cromwell smoked the remainder in a pipe. Although both the Defendant and Cromwell were faced forward and could clearly see the wayside signals, neither called them while smoking the joint. Next Cromwell left his seat and turned facing the rear of the engine to make his lunch while the Defendant sat at the controls. With his back to the cab signals and the warning whistle taped, Cromwell was not aware of the signal change. He did not note any change or reduction of speed while fixing lunch until the Defendant threw the emergency brake.

As soon as Cromwell realized the Defendant had thrown the engines into emergency, he looked out the window and saw that they were in the interlocking. Upon looking back through the rear window, Cromwell saw the headlights of the Amtrak Colonial headed in their direction on the same track. In that instant, Cromwell realized that he had fouled Track 2 and were about to be hit. Cromwell left the cab, jumping from the engine on the east side of the track just before the engine stopped. The Defendant remained on the engine until after the collision.

The Impact. The force of the impact between the Colonial, weighing 1.6 million pounds, traveling at 105 miles per hour, and the stationary multi-ton Conrail consist defies description. The point of impact occurred approximately 336 feet past the home signal located right here at the switch from Track 1 to Track 2. The Colonial's lead engine, which was the 903, struck the left side of the trailing Conrail engine, causing a tremendous explosion. Your Honor, this chart shows the engines and cars as they are after the impact, and

I'll be referring to certain locations as I'm going through here. Just for the record, referring to State's Exhibit 11.

The force of the impact repelled the two forward engines of the Conrail approximately 700 feet and 900 feet respectively down the track. Both remained upright but were derailed. They were located—this is the 5044, and this is the 5052 further up the track. The rear Conrail engine, the 5045, was completely destroyed by the force of the impact. The barely recognizable remnants of this engine came to rest 300 feet at a 12–degree angle to the right of Track 1. This is where the remnants of the 5045 were found. The lead Colonial engine was completely crushed up to its rear cab. This engine derailed and finally stopped on the west side between Track 3 and Harewood Road. This top box located right here would be the 245 engine. The 900 engine, also totalled in the collision, remained upright on Track 2, which is the first one in this group located right here.

The first three coach cars derailed, piling on top of each other. The first coach car containing no passengers was crushed and fragmented. The three that I'm referring to are there, one here and these two, and the one I've just referred to underneath right in that area. The second and third cars were also crushed and further destroyed by explosion and fire resulting from the impact between the Colonial and the Conrail engines. Fifteen passenger fatalities occurred in the second and third cars as well as the most serious injuries to the survivors.

All remaining Amtrak cars derailed. Cars numbered four through nine remained upright but across the track, which would be these cars back to here. The tenth and eleventh cars derailed in line, which are these two cars, and the twelfth and final car derailed upright but was tilted at a 45–degree angle, this car at the tail end.

The Environment At Point Of Impact. The four tracks leading up to and at the Gunpow dissect several small residential neighborhoods in two. Residences on either side of the track are inhabited by many members of the railroad community. All of the homes are individual ones and most are owner-occupied. The tracks often fall within one to 200 feet of the homes in the community. Your Honor, again referring you to the enlarged photograph, which not only shows a photograph of the wreckage, but the homes on the two sides of the track.

At the time of the collision, many residents were at home preparing Sunday dinner, or watching football on television. The force of the collision knocked down one resident of Birdwood Road as she stood in the rear yard hanging clothes on the line within 250 feet of the collision. Many residents witnessing the collision felt as if an earthquake was occurring. The noise and force was felt several miles away.

Residents of the many Chase homes immediately responded to assist in the rescue efforts. Several people ran to the site and assisted in quenching the flames that threatened to engulf the passenger cars. Others climbed into the burning wreckage searching for survivors. Rescue efforts by these residents continued throughout the 4th and 5th of January and, in some cases, through the week. Most residents opened their homes to passengers, police and rescue squads.

Your Honor, there are a number of exhibits as photographs which I would offer at this time. First, State's Exhibit 13 is a photograph similar to the enlarged photograph showing the wreckage of all the cars and engines. The second photograph is Conrail Engine 5045, which is the one thrown to the side and virtually destroyed. The next two photographs, which are Exhibits 15 and 16, are photographs of Amtrak Car No. 21038, one of the first three cars involved in the collision. The final two photographs are State's Exhibits 17 and 18, which are photographs of Car No. 20039, which was the first car in the consist.

The Conrail Crew Post Impact. The Defendant remained on his engine until it stopped. Once on the ground, overwhelmed by the wreckage, he contacted Edgewood Tower Operator Rick Hafer to advise him of the situation. Defendant remained at the wreck site assisting in the

rescue efforts and searching for his co-worker, Cromwell, until his supervisor, Mike Chewar, sent him with Conrail Police to Franklin Square Hospital to provide blood and urine specimens for toxicological testing.

The Brakeman, Cromwell, after jumping from the engine, was knocked down by the explosion on impact. On regaining his senses, Cromwell returned to the lead engine searching for the Defendant and his grip containing the pipe in which he smoked the residue of the joint. Upon retrieving the grip, Cromwell discarded the pipe in a nearby yard. He went to a neighboring home to use a phone to contact his fiancee, Mary Sattler, and to ensure that rescue help was on its way. Cromwell remained at the fire station near the scene until taken to Johns Hopkins Hospital by ambulance where he was treated for a fractured leg.

The Defendant's Admissions Post Collision. On January 4, 1987, between two and 4 o'clock p.m., Christopher A. Strehlein, Safety and Environmental Control Engineer with Amtrak, responded to the scene at Chase, Maryland. While at the scene, he came upon the Defendant, whom he has known for about a year. Strehlein was surprised to see the Defendant, since he had been led to understand that Mike Chewar, Conrail Superintendent, had requested the Defendant go to the hospital for blood and urine tests. Strehlein called Mike Chewar on a portable radio, who told him that the Defendant should go to the hospital. The Defendant refused, indicating he was not injured. Strehlein turned him over to Conrail supervisory personnel. While walking together in response to Strehlein's question concerning the cause of the collision, the Defendant stated it was pretty obvious that, in his words, he fucked up; he got by a couple signals. Strehlein did not detect anything unusual about the Defendant's condition that would indicate a lack of sobriety.

On January 4, 1987, at about 2:20 p.m., Mike Chewar, then Internal Superintendent for Conrail in Baltimore, Maryland, arrived at the accident scene. Chewar questioned the Defendant about the cause of the accident and he responded, "I got by the Stop signal, got out on No. 2 track and got hit by a passenger train."

Russell C. English, a Baltimore County Fire Department Medic Unit Driver, also encountered the Defendant at 2:10 p.m. near the damaged Conrail engines. The Defendant acknowledged to English that he blew a red, or a Stop signal, and was unable to reverse back to his track. Although Mr. English observed nothing to indicate a lack of sobriety, he did note that the Defendant went limp from relief when his radio was taken from him.

The next statement from the Defendant was taken by Henry Payne at 7:30 p.m. on January 4. The Defendant claimed he received a less restricted signal at the distant wayside than actually displayed. Although the Defendant claimed to reduce his speed at this point, pulse records show that, not only did he fail to reduce speed, the Defendant increased speed by throttling up one notch. Furthermore, he claimed the warning whistle, subsequently found taped, tested properly during pre-departure tests.

The Defendant's Conduct Before The NTSB. Edward Cromwell was hospitalized from January 4th to January 6th, 1987 at Johns Hopkins Hospital for a broken leg.

On the morning of January 6th, Mike Chewar, the Terminal Superintendent for Conrail, and Larry Jones, the Road Foreman for Conrail, visited Cromwell at the hospital. The purpose of the visit was two-fold; first, to inform Cromwell that he was being removed from Conrail service and to serve him with a written notice to that effect and, secondly, to have Cromwell respond to questions presented by Mr. Chewar.

Mr. Cromwell testified truthfully to the questions informing Mr. Chewar of the following: That there was only one cab signal test performed on the consist by he and Gates. That the signals at Point and River were Clear, and that he did not know what the signals were at Chase and Gunpow, which would be the Distant and the Home signals. Cromwell explained that he was occupied fixing his and Gates' water bottles

for their lunch, that his back was turned to the cab signal and that he couldn't remember calling any signals. He further stated that the first knowledge he had of any trouble was when the train went into emergency. At the hospital, Cromwell also spoke with Union Representatives, H.A. Bud Daugherty and M.W. Packer, Jr., and advised them that he didn't know what happened.

When Cromwell was released from Johns Hopkins Hospital on January 6th, he went to his home at 3917 Bayville Road in Baltimore County. On the night of January 6th, the Defendant went to Cromwell's house to discuss the next day's hearing before the NTSB. Present at the home was Mary Sattler, Cromwell's fiancee. At that time the Defendant wrote down for Cromwell what was to be his account of the accident. The Maryland State Police handwriting expert, Lieutenant Gary Girton, examined this writing and concluded that the Defendant wrote it. Cromwell agreed he would testify in this manner at the hearing the next day. When the Defendant was discussing the cab signal, Cromwell told him that he hadn't seen it. The Defendant told Sattler and Cromwell that the NTSB would not see it that way. When Sattler told the Defendant that he was the one driving the train, not Cromwell, the Defendant replied that NTSB won't see it that way. The Defendant also discussed what they would say to make the wayside and the cab signals coincide. Sattler asked the Defendant what did happen. He responded, "I messed up."

The story the Defendant wrote for Cromwell was the one which Cromwell subsequently told to the NTSB. At the meeting with the Defendant, on January 6th, 1987, according to Cromwell, he asked the Defendant if he had told anyone about the marijuana. The Defendant said he had only told Bud Daugherty, who is the United Transportation Union Representative. According to the Defendant's account of his conversation, Cromwell asked to whom he had told everything, and he responded it was only Bud Daugherty.

On January 7th, the NTSB held a hearing in Baltimore City. Participating in the hearing were members of the NTSB, FRA —the Federal Railroad Administration— and Union Representatives, including H.D. Bud Daugherty. The purpose of the hearing was to obtain testimony from the Defendant and the brakeman, Cromwell.

Cromwell's testimony included the statements that both front and back cab signal tests, as required, were done on the Conrail consist and that at the Chase signal—the 81.6 Milepost—the Defendant called Approach Limited and Cromwell looked at the cab signal and saw an Approach Medium. Both statements about tests and signals were untrue. Cromwell also told the NTSB that he had not used drugs the day of the crash. That statement was also false.

The Defendant also testified at the NTSB hearing and stated he had performed the two required cab signal tests on the consist, and that he had an Approach Limited on the wayside signal at Chase and a corresponding Approach Medium in the cab. The Defendant further told the hearing board that Cromwell had seen Approach Medium on the cab signal at Chase. When asked if he had used drugs on the day of the accident, Gates responded that he hadn't.

On Wednesday evening, January 7th, 1987, Thomas A. Goldsborough, a Chessie System Conductor, met the Defendant at the Tandem Lounge, which is a bar frequented by railroad personnel. Goldsborough was there with another Chessie employee, Roger Clark, all acquaintances of the Defendant's. After entering the bar, the Defendant began conversing with Clark and Goldsborough. He questioned why Clark had not spoken to him. At this time, the 11 o'clock news was running a story on the collision. The Defendant became upset saying the media was not telling the truth. The Defendant told Clark and Goldsborough he was going to try to sell his story for a million dollars.

Defendant's Drug Test. At approximately 4 o'clock p.m. on January 4, 1987, Trainmaster Henry Payne located the De-

fendant walking along the east side of the accident site. Payne brought the Defendant to Mike Chewar, Terminal Superintendent, and Edwin Byer, Captain of the Conrail Police Department. Chewar then instructed Trainmaster George Mince and Captain Beyer to take the Defendant to Franklin Square Hospital for treatment and to have a toxicology test sample drawn. The Defendant was again advised by George Mince that FRA rules require that he submit to a toxicological screening of his blood and urine. Samples of both were obtained from the Defendant, packaged, sealed and sent to the FRA CAMI Lab, which is a civil Aeromedical Institute in Oklahoma City for analysis. The results of the toxicological analysis by CAMI for the Defendant indicated the presence of Marijuana THC, a Schedule I non-narcotic controlled dangerous substance in both blood and urine samples tested using two different quantification techniques. Tests for all other drugs in the protocol were negative. The urine sample of the Defendant was then sent by CAMI to the Center for Human Toxicology at the University of Utah pursuant to the NTSB's request due to irregularities at CAMI not affecting this case. Again, the presence of Marijuana THC was confirmed. All other drugs were negative.

Expert witnesses who have reviewed the levels of marijuana in the Defendant's blood and urine have been unable to render an opinion regarding impairment.

A blood sample taken from the Defendant by Franklin Square Hospital for medical diagnostic purposes was screened for alcohol and drug use and showed less than 10 milligrams, or less than .01 percent blood alcohol level. The Franklin Square Hospital test was negative for all other drugs, including cocaine metabolites and PCP. Franklin Square Hospital, however, does not test for Marijuana THC or its derivatives.

The Victims Of The Collision. In addition to the death of the Amtrak Engineer, Jerome Evans, 15 passengers were killed as a direct result of the collision. Caroline and Uriel Bauer, ages 26 and 27, respec-

tively, a recently married couple who resided in Manhattan, New York, both occupied the second coach car, which is the second passenger car in the consist. Caroline was pronounced dead at 7:12 p.m. on January 4th, 1987 as a result of cranial injuries and smoke inhalation. Her husband, Uriel, was pronounced dead at 3:57 a.m. on January 5th, 1987 as a result of compression asphyxiation.

Esther Burkhart, age 71, who lived in Philadelphia, Pennsylvania, also occupied the second car. Mrs. Burkhart died as a result of multiple traumatic injuries primarily to her head and chest.

James Clay, age 33, from Vernon, Connecticut, sat in the second car. Mr. Clay was pronounced dead at 4:38 a.m. on January 5, 1987 as a result of compression asphyxia.

Thomas Colley, Jr., age 18, a freshman at the Rhode Island School of Design, sat in the second car on his return to school in Providence. Thomas was pronounced dead at 7:45 p.m. as a result of multiple blunt injuries, burns and smoke inhalation.

Laura Corti, age 22, occupied the second car on her return home to New York City. She was pronounced dead at the scene at 4:05 a.m. on January 5, 1987 from compression asphyxia.

Louise Edler, age 70, a resident of Wayne, Pennsylvania, occupied the third car in the consist. Mrs. Edler died of multiple injuries.

Ceres M. Horn, age 16, a resident of Baltimore County, Maryland was returning to school at Princeton University, where she was a freshman honor student. Ceres, who sat in the second car, died as a result of compression asphyxia.

Christiane Johnson, age 20, a senior at Stanford University, rode in the second car traveling from her parents' home in Potomac, Maryland to New York to visit her sister. Christiane was pronounced dead at 4:48 a.m. on January 5, 1987 as a result of compression asphyxia.

Corrine and Kirsten Luce, sisters, age 13 and 16 respectively, occupied the second coach car on their return home to Westerly,

Rhode Island. Kirsten was pronounced dead at 5:25 a.m. on January 5, 1987 from cranio-cerebral trauma. Corrine was pronounced dead at 1 o'clock p.m. on January 5, 1987 due to multiple trauma to the cranio-cervical and thoracic region.

Adam Moore, age 7, and his grandmother, Peggy Moore, age 52, were seated in the second car on their trip home to Neptune, New Jersey. Adam was pronounced dead at 11:24 p.m. on January 4, 1987 as a result of compression asphyxia. Mrs. Moore was pronounced dead on January 5, 1987 at 1:14 a.m. due to multiple injuries.

Christina Piasecka, age 41, from Warsaw, Poland occupied the third car. Ms. Piasecka died of multiple injuries.

Connie Barry, age 31, occupied the second car on her return home to Ridgefield, Connecticut after visiting family in the Washington area. Mrs. Barry was trapped in the wreckage for 10 hours while rescue workers attempted to free her. She was flown by helicopter to Shock Trauma, where she subsequently died at 6:20 a.m. on January 13, 1987 as a result of multiple injuries and hypothermia.

Approximately 174 passengers and crew of the Colonial sustained serious injuries and required treatment at local hospitals. Numerous fire fighters, police, paramedics, and National Guard responded to the wreck site to render emergency assistance.

Your Honor, for the record, the exhibits that I have previously mentioned we would move into evidence at this time.

THE COURT: Received.

MR. COX: Do you want me to refer to them, your Honor?

THE COURT: No. I'll receive the exhibits that have been pre-marked and referred to in the Statement of Facts. Any additions or corrections?

MRS. SCHEARER: None, your Honor.

THE COURT: All right. Obviously, the Statement of Facts amply supports the entry of the guilty plea. The verdict is guilty of Count 1.

MRS. SCHEARER: Your Honor, at this point we would request that the Court order a Pre–Sentence Investigation. Primarily, we would like that to reflect the Defendant's conduct since he's been placed on probation with this Court for a driving while intoxicated charge. We'd also request the Defendant be allowed to remain on bail pending sentencing, that the bail remain the same.

THE COURT: Mrs. O'Connor?

MRS. O'CONNOR: We have no objection to either.

THE COURT: All right. The Defendant remains on the pre-trial release status that he came here on today. I will order the Pre–Sentence Investigation requested.

Let's set sentencing for Tuesday, March 29th, 1988 at 1:30 p.m. I think that will give the Probation Department enough time to prepare the Pre–Sentence Investigation.

MRS. SCHEARER: Thank you, your Honor.

THE COURT: Is there anything further?

MRS. O'CONNOR: Nothing further from the State.

MRS. SCHEARER: Nothing from the Defense, your Honor.

THE COURT: All right. We'll stand in recess in this case until 1:30 p.m. on March 29, 1988, at which time we'll have sentencing.

MRS. SCHEARER: Thank you, your Honor.

(At 11:25 a.m., proceedings adjourned.)